## HARRY NEWBY v. STATE.

No. A-3160.    Opinion Filed March 15, 1920.

(188 Pac. 124.)

(Syllabus.)

1. **HOMICIDE—Degrees—Duty to Instruct.** Where there is slight evidence which tends to reduce the degree of the homicide from murder to manslaughter in either of its degrees, the trial court should give the defendant the benefit of any doubt which the evidence may suggest, and instruct the jury upon the law of each degree which the evidence tends to prove.

2. **TRIAL—Duty to Instruct—Evidence to Support.** The trial court is not required, however, to delve into the realms of conjecture or speculation in order to instruct upon some chimerical theory of the law of the case not reasonably supported by the evidence.

3. **HOMICIDE—Murder—Refusal to Instruct on Manslaughter.** The refusal to give manslaughter instructions in a prosecution for murder is not error, if there is no evidence tending to reduce the degree of the crime from murder to manslaughter in either degree.

4. **TRIAL—Custody of Jury in Officer Who Was State Witness—Necessity for Injury.** Where a deputy sheriff, who was a witness

for the state in rebuttal, was duly sworn and placed in charge of the jury, together with another duly sworn bailiff, during a recess in the trial, without objection being made by the defendant, and there is no showing that the said bailiff communicated with any member or members of the jury concerning the case, or permitted others to do so, or that the jury was in any way tampered with or subjected to any improper influences during said recess, the judgment of conviction will not be reversed on such ground.

5. **APPEAL AND ERROR—Discretion of Court—New Trial for Newly Discovered Evidence.** Motions for a new trial on the ground of newly discovered evidence are addressed to the discretion of the trial court, and there must be a showing of manifest abuse of such discretion before the judgment will be reversed on this ground.

*Appeal from District Court, Delaware County;*
*John H. Pitchford, Judge.*

Harry Newberry was convicted of murder and sentenced to life imprisonment, and he appeals. Affirmed.

This an appeal from the district court of Delaware county in an action commenced in said court on the 19th day of March, 1917, by information duly filed by the county attorney of said county, charging the defendant with the murder of one Ben Price by shooting him with a 45 Colt's revolving pistol on the 18th of December, 1916. Death resulted from a bullet wound in the head, which entered near the left temple and had its exit above the right ear.

The killing occurred on a public street in the town of Jay, said county, between the hours of 8 and 9 o'clock at night. The state introduced witnesses who testified that on said day the defendant had driven in an automobile to the town of Southwest City with his brother, Teenie Newby, and two young ladies, one of whom was the sister of the deceased. After shopping some in Southwest City they returned to their homes in Jay, traveling by automobile,

which was owned by the defendant. The evidence also discloses that the defendant had been drinking some, a fact which he admits, but testifies himself that he was in full possession of his mental faculties and knew everything that occurred prior to and at the time of the alleged homicide.

According to the state's witnesses, the defendant was seen a short time prior to the commission of the homicide carrying some whisky in quart bottles in his pockets, also an open knife, the blade of which was protruding from his coat pocket on the left side, and in addition he was armed with a 45 Colt's revolving pistol. The state introduced two witnesses, full-bloood Indians, who testified through an interpreter that they were eyewitnesses to the killing, standing a short distance away with a lighted lantern at hand, and that the defendant shot the deceased with a pistol; that they were quarreling; that the deceased at the time said to the defendant, "Don't"; and after the defendant had shot deceased and deceased had fallen to the ground the defendant ran away from the scene and made no effort to ascertain the result of the shot.

If the witnesses for the state are to be believed, the killing was a willful, deliberate, and malicious one, and constituted, under the statutes of this state, the crime of murder.

The defendant, however, took the witness stand in his own behalf and admitted that he had on that evening a 45 Colt's pistol, but stated that the deceased wanted to look at it, and that just a short time before the shot was fired the defendant handed the pistol to the deceased, and the deceased after taking it into his hands wanted to fire it, but that the defendant told him not to do it as it would cause them trouble; that "somebody was getting sore about

shooting around at night"; that thereupon the defendant asked deceased to return the pistol; that defendant was walking slightly behind the deceased but close to him, and that the boy apparently started to hand the defendant the pistol and it became discharged some way unknown to the defendant; that it was purely accidental; that he (defendant) did not shoot the deceased or have hold of the gun at the time it was discharged; that after deceased fell the defendant became very much distressed and excited over what had happened, and walked up to deceased and spoke to him and undertook to pick him up; that deceased was making some kind of distressing noise, and that defendant became confused and excited to such an extent that he did not remember what happened after that; but that he (defendant) finally made up his mind what he ought to do after having picked up the pistol when he started to leave the body of the deceased; and that he took the pistol to the home of deceased's parents and stated to members of the family of the deceased who were assembled at the home, after leaving the pistol there, "This is the gun Ben killed himself with."

In order that a more definite understanding may be obtained of exactly what occurred at the precise time of the shooting, the following excerpts from the testimony of eyewitnesses is incorporated herein. Blossom James testified in part:

"Q. Which side of town is the doctor's drug store on? A. North. Q. Did you see Harry Newby that night? A. Yes, sir. Q. Did you see Ben Price also? A. Yes, sir; I saw him too. Q. Where were they? A. They were standing near a telephone pole. Q. Where is that from Dr. Marshman's drug store? A. It is west. Q. How far from the drug store? Indicate by pointing out the distance. A.

About 17 feet. Q. What did you see take place there? I will ask you if the shot was fired while you were there at the drug store. A. Yes, sir; we were close to the drug store. Q. Who fired the shot? * * * A. Harry Newby fired the shot. Q. What happened? A. He fell down at the report of the gun. Q. Who fell? A. Ben Price. Q. How far was Harry Newby from Ben Price when the shot was fired? A. About the distance of the length of a broom. Q. State to the jury all that you saw and heard of this transaction? A. I didn't know, only just Harry Newby run and went down towards the barn and down the road leading towards the schoolhouse. Q. How were they standing when the shot was fired, Harry Newby and Ben Price? A. Newby was on that side (indicating) and Ben was on this side (indicating). Q. State the direction that Newby was from Ben Price. A. He was a little bit south. Q. You say a little south—south and what other direction—do you know what is north and south and east and west? A. Yes, sir. Q. Which way is south? Indicate by pointing. A. Back that way (indicating). Q. Which way is west? A. That way (indicating). Q. Now indicate by pointing at some object where Ben Price was and where Harry Newby was when the shot was fired. A. One was east a little. Q. Which one was east? A. Ben Price. Q. How did you come to be down there at Dr. Marshman's store? A. My father was sick, and we were sent there for medicine. My mother sent me. Q. Where did you go from the store, where did you come from to the store when you came to town? A. We came from home, where we live. Q. After you came to town, state where the last place you were before you came down to the drug store. A. I had been at Charley Bowles' store. Q. Did you leave Charley Bowles' store and come direct to the drug store, or did you wait on the road or go any other place? A. We went directly from Bowles' store down to the drug store and hadn't been long there when the shooting occurred. Q. State what was said or what you heard before the shooting occurred, or at any time between Harry Newby and Ben Price, if you heard anything. A. Harry

Newby cursed him. Q. Cursed who? A. Ben Price. Q. Could you understand what was said? A. I didn't understand very much of it. I can't understand but very little English. Q. Where did you go after the shooting occurred? A. We were standing out there in front of the drug store. Q. Did you go any place then immediately after the shot was fired? O. We stayed there in front of the store directly after the shot was fired. Q. Who was there with you, Blossom? A. John Horsefly. Q. Who was the first person you saw after the shooting? A. I saw John Horsefly the first one after the shooting. Q. Who next did you see? A. His brother. Who is his brother? That man over there (indicating). Q. Do you mean Teenie Newby? A. Yes, sir. Q. Where was Teenie Newby? A. He was there a little bit south of them. Q. How long was that after the shooting? A. Quite little bit afterwards. That is about all I know. Q. Did you see George Roberts? A. Yes, sir. We went after him. Q. Who went after him? A. John. Q. John who? A. John Horsefly. Q. How long was that after the shooting? A. Right away afterwards. Q. When you saw George Roberts, was that before you saw Teenie Newby or afterwards? A. I think I saw Teenie Newby first. Q. You saw Teenie Newby before you saw George Roberts? A. Yes, sir. Q. How long was that after the shooting? A. Quite a little bit. Q. What was the first thing Harry Newby did after the shooting took place? After he fell Harry Newby run down towards the barn and run towards the schoolhouse. Q. After who fell? A. Ben Price. Q. Did Harry Newby stop and go to Ben Price after he fell and before he ran? A. No, sir; he run right away. Q. Did you see Harry Newby any more after that? A. Yes, sir; I saw him when the folks were going down afterwards. Q. Did Harry Newby say anything at the time of the shooting? A. No, sir. Q. Did he say anything after the shot? A. No, sir. Q. Did Ben Price say anything before the shot? A. He said, 'Don't.' Q. Did he make any noise at the time of the shot or immediately afterwards? A. He hollered when he was shot. Q. Did you have anything with you there? A.

Yes, sir. Q. What was it? A. I had a lantern. Q. Was it lighted? A. Yes, sir. Q. Did you see Harry Newby shoot the pistol himself? A. Yes, sir; I saw him shoot. Q. Did you hear Ben Price say anything else? A. That is all I know, is hearing him say, 'Don't.' Q. Do you know how Harry Newby had hold of the pistol? A. Yes, sir. Q. Take this pistol and show the best you can the position he was holding it? A. He had it pointed towards Ben (indicating) and shot."

John Horsefly testified substantially the same as Blossom James as to matters and events leading up to and surrounding the alleged homicide.

The defendant testified concerning what occurred at the time of the shooting as follows:

"Q. Who had the whisky? A. I had it when we went in the house. Q. Where did Bill Blackburn go? A. He went back in the house. Q. Where did Teenie Newby go? A. Well, I couldn't swear where Teenie went, because I didn't see him. I left him there. I and Ben started towards the barn and I left him standing there at the porch. Of course I had an idea where he was going when he refused to go to the dance. Q. Did you ask him to go to the dance with you? A. I asked him if he was going and he said he wasn't. Ben then spoke up and asked him to go along. Q. Where did you and Ben Price go? A. We went down towards the barn. Q. Well, what happened? A. Well, we started off when we left Teenie there. I never asked Ben no questions. We started off. Ben was on my right side walking along by me and I was on the outside of the sidewalk. We walked down the road and was talking about something. I said, 'Did Dynie ride my horse very hard?' and he said, 'No;' he didn't think he did. I said, 'Was he sweating any?' and he said, 'Yes; he was sweating a little bit in the flanks;' and we just walked on down the street. So we got down to Marshman's and Ben asked me—he seen, I suppose that I had a gun on—and he asked me for

it, and I let him have the gun. So he asked me to let him shoot the gun, and I told him, 'No; don't shoot'; we would get into it. They had been kicking about that shooting around over town, and I told him better not shoot. So he cocks the gun a time or two; I could hear it clicking; and so—when I handed him the gun I don't know whether I pulled off one of my gloves, but anyway I had something in my hand and was monkeying with it, whatever it was, and I and Ben was only just a little ways apart, and when I handed him my gun and whatever this was in my hand I was monkeying with and had fell a little behind him, and when he asked me to let him shoot and I said 'No,' he just said 'Here,' and I thought was handing me back the gun, and I just reached out with my right hand to get the gun, and never took my eyes off of what I was monkeying with —I don't know which hand or anything of the kind he had the gun in—and as I reached my hand out when he said 'Here,' when I turned my head to see what was the reason I didn't get hold of the gun or feel anything, just as I turned my head the gun went off and Ben fell. I never had yet touched the gun. I run around in front of him and jumped down on my knees and grabbed him by the head and called him four or five times. He didn't answer, but he was kind of struggling and I tried to pick him up, or rather did pick him up, and I couldn't get him to answer and I laid him down, and he was struggling so and I looked in his face and just got scared, and I just grabbed my gun, which was laying by his left hand, and started to run, and I run down in front of Dan Price's livery barn and run out a little ways, and after I had gone a little ways I come to myself—got over my excitement a little—and then went up by my house and thought I would unlock the door and throw the gun in the house; and I was so nervous and scared I couldn't get the key in the keyhole, and it was dark, and I just turned and run up to Dan Price's and laid the gun down on the washstand and told Mrs. Price, 'This is the gun the boy shot himself with.' * * * Q. Mr. Newby, did you kill this boy or shoot him as these Indians, this

man John Horsefly and Bossom James, say you did? A. No, sir; I did not. Q. Did you have anything to do with killing the boy whatever? A. Not a thing in the world. The boy's life was merely an accident, I suppose—the boy's death.

### "Cross-Examination.

"Q. Did you ask Ben Price to go out with you that night? A. No, sir; I did not. Q. Did you ask him to go any place with you after you got out? A. No, sir; I did not. I never asked him to go. He stated there to Teenie, 'Come and go with us to the dance'; and my calculation was for Ben to ride behind me on the horse if he was going. Q. Where? A. To Bill Buzzard's. Q. Was there a dance there. A. They told me there was going to be one. Q. Who told you? A. Mrs. Johnson told me the day before. Q. Isn't it a fact that there was no dance there at all? A. I don't know. I was in jail that night and I didn't go. Q. Don't you know that there was not going to be a dance there? A. I don't know. They told me there was. That is all I know. Q. Wasn't you drinking pretty heavy that night? A. Not very heavy. Q. Did you know what you were doing? A. Sure I did. Q. You knew everything that you were doing? A. Yes, sir; I did. Q. Did you have a knife in the front of your coat? A. No; I never had no knife in front of my coat that I know of. The best I have any recollection of my knife I left it at my house where I had been vulcanizing inner tubes. Q. Did you have a quart bottle of whisky in each pocket? A. No, sir; I did not. Q. Did you have a quart bottle in each pocket? A. No, sir. I just had one bottle, and I had it in my right coat pocket with about that much (indicating) whisky in it. Q. You say you were not drunk? A. I. say I wasn't drunk enough not to know what I was doing all right. Q. You say you and Ben Price were walking along by yourselves—anybody else around there at all when the killing occurred? A. No, sir. Q. That is what

you say, is it? A. Yes, sir; that is what I say. Q. Did your hand touch that gun? A. No, sir; it did not."

The defendant requested the following instructions:

"You are instructed that, while the information in this case charges the defendant with the commission of the crime of murder, it also contains and includes a charge of manslaughter in the first degree. Manslaughter is the unlawful killing of a human being without malice, either express or implied, and without deliberation. In this state homicide is manslaughter in the first degree when perpetrated without a design to effect death and in the heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon, unless it is committed under such circumstances as constitute justifiable homicide.

"Refused.          JOHN H. PITCHFORD, *Judge.*

"Defendant excepts."

"From the definition given you will perceive that the characteristic distinction between murder and manslaughter is the existence of malice, either express or implied; and it therefore becomes necessary, in every case of homicide, to ascertain the nature of legal malice, and what evidence is requisite to establish its existence. The rule is that the implication of malice arises in every case of intentional homicide, and the fact of killing being first proved by satisfactory evidence, all the circumstances of accident, necessity, or infirmity are to be established by the party charged, unless they arise out of the evidence produced against him to prove the homicide; and where the fact of killing is so proved, and there are no circumstances disclosing or tending to show justification or excuse, then there is nothing to rebut the natural presumption of malice. This rule is founded on the plain and obvious principle that a person must be presumed to intend that which he voluntarily and willfully does, and that he must intend

all the natural, probable, and usual consequences of his own acts.

"Refused.　　　　　JOHN H. PITCHFORD, *Judge.*

"Defendant excepts."

"If, after a careful and dispassionate consideration of all the evidence in the case there should rest upon your minds a reasonable doubt of the guilt of the defendant of the crime of murder, as explained in these instructions, then you will consider whether he is, under the evidence, guilty of manslaughter in the first degree; and if there should so rest upon your minds a reasonable doubt of his guilt of murder, but you find from the evidence, beyond a reasonable doubt, that the defendant is guilty of the crime of manslaughter in the first degree, as defined and explained herein, you will so say by your verdict, and in that event you will assess his punishment by imprisonment in the penitentiary for any length of time not less than four years and it may be for his natural life, that is, for any length of time from four years up to his natural life.

"Refused.　　　　　JOHN H. PITCHFORD, *Judge.*

"Defendant excepts."

"You are also further instructed that, although charged with murder, the crime of manslaughter in the second degree is included in the charge, and you are instructed that manslaughter in the second degree is defined as follows: Any killing of one human being by the act, procurement, or culpable negligence of another, which, under these instructions, is not murder, nor manslaughter in the first degree, nor excusable or justifiable homicide, is manslaughter in the second degree.

"If after reviewing all the evidence in this case you find beyond a reasonable doubt that the deceased met his death at the hands of the defendant by reason of the act or culpable negligence of the defendant, and not with premeditated design, or if after reviewing the evidence there

rests upon your minds a reasonable doubt as to whether or not there was any premeditated design, and if after reviewing the evidence you cannot say that the deceased met his death at the hands of the defendant in the heat of passion or in a cruel and unusual manner, then you will find defendant guilty of manslaughter in the second degree, in which case you will fix his punishment by imprisonment in the penitentiary not more than four years and not less than two years, or by imprisonment in the county jail not exceeding one year, or by a fine not exceeding $1,000 or both such fine and imprisonment.

"Refused.                    JOHN H. PITCHFORD, *Judge*.

"Defendant excepts."

"You are instructed that when a defendant is being prosecuted for murder he is not required to reasonably account for all the facts and circumstances, together with all the direct evidence in the case relied upon by the state to secure a conviction, upon some theory consistent with his innocence. If there is a reasonable doubt as to his guilt, without explaining any fact or circumstances relied upon by the state, he should be acquitted; or, if the explanation of one or more facts raises a reasonable doubt as to his guilt, he must be acquitted, without explaining all the facts and circumstances relied upon by the state.

"Refused.                    JOHN H. PITCHFORD, *Judge*.

"Defendant excepts."

The trial court, of its own motion, gave ten separate instructions submitting the case upon the issue that the defendant was either guilty of murder alone under the evidence adduced by the state or was entitled to an acquittal if the jury believed his defense to be true, or if said defense raised a reasonable doubt in their minds of his guilt of murder. Instruction No. 8 given by the court covers the

theory of the defense interposed from the viewpoint of the trial court, and is as follows:

"You are instructed that if you believe and find from the evidence in the case, beyond a reasonable doubt, that the defendant, on the occasion mentioned in evidence, fired the shot which killed the deceased in the manner and form as charged in the information and as before explained in these instructions, then he would be guilty of murder as charged, and you should so say by your verdict. On the other hand, you are instructed that the defendant pleads as a defense that the deceased came to his death by the accidental discharge of the pistol by the deceased, or when said pistol was not in the hands of the defendant; and if you believe that the killing was a result of the accidental discharge of the pistol by the deceased, or by the discharge of said pistol when same was not in the hands of the defendant, then and in that event your verdict should be one of acquittal; or if the evidence on the proposition as to whether the defendant fired said shot raises in your minds a reasonable doubt of his guilt, as herein explained, it would be your duty to give him the benefit of the doubt and acquit him."

*Ad V. Coppedge* and *E. B. Hunt,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON J. (after stating the facts as above). Counsel rely almost entirely for a reversal of this judgment upon the ground that it was error under the issues in this case for the trial court to fail and refuse to instruct the jury on the law relative to manslaughter in the first and second degrees, as requested by counsel, to which action proper exception was taken at the time, and again urged as error in the motion for new trial and in the petition in error filed in this court.

Counsel for the defendant upon this proposition rely upon the decisions of this court, which hold:

"In a prosecution for murder, the court should submit the case to the jury for consideration upon every degree of homicide which the evidence in any reasonable view of it suggests; and, if the evidence tends to prove different degrees, the law of each degree which the evidence tends to prove should be submitted to the jury, whether it be requested on the part of defendant or not." *Kent v. State,* 8 Okla. Cr. 188, 126 Pac. 1040; *Steeley v. State,* 17 Okla. Cr. 252, 187 Pac. 821.

Upon the oral argument it was urged that the peculiar circumstances under which the deceased met death were so surrounded in mystery and uncertainty that it was possible, if not clearly probable, that the defendant, either in the heat of passion or else by his own culpable negligence in the handling of the pistol at the time of its discharge, may have not been entirely blameless but guilty of either manslaughter in the first or second degree, and that instructions along the lines requested should have been given.

As heretofore repeatedly held, we deem the law to be that, if there is even slight evidence which tends to reduce the degree of the homicide from murder to manslaughter in either of its degrees, the trial court should give the defendant the benefit of any doubt which the evidence may suggest, and instruct upon such lower degrees. However, the court is not required to delve into the realms of conjecture or speculation in order to instruct upon some theory of the case not reasonably supported by the evidence.

Section 5902, Revised Laws 1910, provides:

"Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving

circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

The evidence in this case on the part of the state, if believed, proved the defendant guilty of murder. There was nothing in the state's evidence that tended to reduce the degree of the homicide to manslaughter, and the defendant made no effort to justify or excuse the killing. In fact, he denied having killed the deceased at all. According to the defendant's testimony the deceased killed himself, whether purposely or accidentally the defendant does not know; but the defendant is certain that he himself had nothing whatever to do with the killing. The issues presented, therefore, were clear-cut and permit of no middle ground. Either the defendant killed the deceased in the manner testified to by the state's witnesses, or else the deceased met his death at his own hands without any fault or criminal culpable negligence on the part of the defendant. The decisions of this court relied upon by the defendant's counsel, therefore, are not controlling in this case, but this case is determined by other decisions of this court holding as follows:

"The refusal to give manslaughter instructions is not error if there is no evidence to reduce the degree of the crime from murder to manslaughter." *Hunter v. State,* 3 Okla. Cr. 533, 107 Pac. 44; *Morris v. State,* 4 Okla. Cr. 233, 111 Pac. 1096; *Hopkins v. State,* 4 Okla. Cr. 194, 108 Pac. 420, 111 Pac. 947; *Ryan v. State,* 8 Okla. Cr. 623, 129 Pac. 685; *Fritz v. State,* 8 Okla. Cr. 342, 128 Pac. 170; *Updike v. State,* 9 Okla. Cr. 124, 130 Pac. 1107; *Robinson v. Territory,* 16 Okla. 241, 85 Pac. 451; *Regnier v. Territory,* 15 Okla. 652, 82 Pac. 509.

Further, in the case of *Sayers et al. v. State,* 10 Okla. Cr. 233, 135 Pac. 1073, it is held:.

"When a defendant, who has the right of election as to several defenses, takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one."

Applying the law contained in the decisions of the Supreme Court of the territory of Oklahoma and of this court in the cases last above quoted to the facts of this case, we find no prejudicial error in the refusal of the trial court to submit to the jury the question of the defendant's guilt either of manslaughter in the first or second degree.

It is also contended that the trial court erred in placing one Mat Francis, a deputy sheriff, as a bailiff in charge of the jury after he had testified as a state's witness. The record shows that Mat Francis testified as a witness for the state on rebuttal, and it is further disclosed by the record that before the argument had been concluded in the cause the jury was placed in charge of two sworn bailiffs, to wit, Tom Ballard and Mat Francis, to be kept together under proper instructions of the court during the adjournment of the trial from Saturday evening until the trial was resumed the following Monday morning.

Counsel for the defendant at the time interposed no objection to the said Mat Francis being placed in charge of the jury in conjunction with the other sworn bailiff, Tom Ballard, during said recess of the court. It was not until after the verdict had been returned that defendant for the first time urged this as an alleged error prejudicial to his substantial rights. It is not contended that the jury, by reason of the fact that Mat Francis was one of the

sworn bailiffs placed in charge of it, was in any way tampered with or subjected to any improper influences. In fact, it is stated in the brief filed in behalf of the defendant that "no charge is made that this bailiff made any improper suggestions to the jury"; that the objection is based solely on the ground that he was permitted "to associate with the jury" in the capacity of a bailiff during the recess.

In the absence of any showing that the said bailiff in any manner communicated with any member or members of the jury concerning the case, or permitted others to do so, and in view of the fact that the defendant made no objection to his serving in this capacity until after the verdict was returned, and in view of the further fact that it is provided in section 6005, Revised Laws 1910, that no judgment of conviction shall be reversed as to any error of procedure unless after an examination of the entire record it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right, we are impelled to the conclusion that this assignment of error, under the circumstances presented, is without prejudice to the substantial rights of the defendant.

It is also contended that the court erred in overruling the supplemental motion for a new trial on the ground of newly discovered evidence. We consider this assignment of error without substantial merit, as the evidence, if produced, would be cumulative and in the nature of impeachment of witnesses for the state, who were attempted to be impeached along the same lines by other witnesses introduced at the trial. It is not clear that the alleged newly discovered evidence would produce a different result if another trial should be had, and as this was a matter ad-

dressed to the discretion of the trial court, and as no mani-fest abuse of discretion appears, the judgment will not be reversed on this ground.

Defendant was repre ented in the court below by coun-sel who left no stone unturned in their efforts to get be-fore the jury the defendant's theory of defense, and to break down where possible the credibility of the evidence of the state's witnesses.   An able brief has been filed in his be-half in this court, and his cause was earnestly presented in an oral argument.

After a full consideration of all the points urged by counsel for defendant and assigned and relied upon as reasons for reversal of this judgment, we conclude that none of the errors complained of were of such a funda-mental character or so prejudicial as to deprive the ac-cused of that fair and impartial trial which is guarantee to him under the Constitution and laws of this state.

The judgment is therefore affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.