# ELLIOTT BAKER v. STATE.

No. A-7316.   Opinion Filed Oct. 4, 1930.
(292 Pac. 82.)

Claud Briggs and C. R. Hunt, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DAVENPORT, J.   The plaintiff in error, hereinafter for convenience referred to as the defendant, was tried for murder and convicted of manslaughter in the first degree, and was sentenced to serve a term of five years in the state penitentiary.   Motion for new trial, and motion in arrest of judgment was filed, considered, and overruled, exceptions saved, and the defendant by petition in error with case-made attached has appealed to this court.

The substance of the testimony of the state is as follows:

Mrs. Mary Sherfield stated that on the 18th of January, 1927, she was living on the Wayne Boone place in Latimer county, Okla.—

"J. W. Sherfield was my husband at that time; I knew Elliott Baker; he married my daughter, who was a stepdaughter of J. W. Sherfield; Elliott Baker, his wife and baby came to our house about 7:30 p. m., and holloed; we had gone to bed; Mr. Sherfield got up and went to the door and asked who was there, and no one answered, and he opened the door and Annie and Elliott were at the door, and they rushed in, and Mr. Sherfield said, 'Hello children, come in'; Elliott was carrying two suitcases in his left hand and had his right hand in his pocket; Annie was carrying the baby; Annie sat down and Elliott kindly walked around; Mr. Sherfield went back to the bed and put his clothes on and came back to the fire; the parties were talking back and forth, and after they got warm I asked them if they had had any supper and they said they had not, and my daughter Florence and I stepped in to fix some supper; Mr. Sherfield was standing in front of the fire place and Elliott was walking around; when we got supper ready, Annie came in, but Elliott refused to come in; Mr. Sherfield tried to get him to come in, and Elliott said he did not want any of the God damned old stuff; Annie ate her supper, and Elliott said he wanted to know why we had not answered the letters he had written, and we said we did not get his letters; he said he had written three letters and sent a phone message; my husband, Wellington, spoke up and said we did not get any of them; Elliott kept quarreling around about it, and kept asking us about not answering his letters and about having sent a phone message to the Blalock place; I went in the north room and waked Roy Sherfield and told him to go and get Walter Norman; I believed we were going to have some trouble; in a few minutes Walter Norman and Roy came in; when they

came in Elliott jumped up and said, 'Looks like you have sent for more help, I am ready for them, I am a mean Indian and have plenty of money to pay my way, and if I have to go to jail I don't care, jail is my home;' my husband told him there was no one mad at him, and he replied, 'I know a damn sight better;' the defendant then told Annie to get her wraps, and Wellington said it was too far and cold for them to start out again, but 'if nothing will do you but go home, there is the door,' and Elliott said, 'Make me,' and went toward Mr. Sherfield, and Mr. Sherfield pushed him back; Elliott come up again and cut my husband with a knife in the left side; Walter Norman took the knife away from Elliott and kindly pushed and scuffled with the defendant and got him out of the house and bolted the door; my husband staggered to the bed and said he was cut; he laid down on the bed and began groaning and said he was sick and began to vomit; Walter Norman went for Sherman Walden and brought him to the house; Elliott Baker called and wanted me to come out of the house, and I went out on the porch, and he said he would come to see me more often but he did not like Mr. Sherfield; I went back in the house and he called me again; Sherman Walden went for the doctor; Mr. Sherfield did not attack the defendant in any way; he did not have a pistol or a knife; there was a six-shooter in the house, but it was between two mattresses on the bed; Mr. Wayne Boone had left a gun hanging up on a rack; after the trouble began I raised up the mattress and took out the pistol; Elliott was still in the yard, and I took it out thinking if Elliott started in the door I would have some protection; when he did not start in the door I put it back; Mr. Sherfield did not come in the room while Annie was eating her supper. This occurred on the 18th day of January, 1927, and on the 23d day of January, 1927, Mr. Sherfield died; he got up a few minutes on the third day and also on the fourth day; he was only up a short while each time; he was in his usual good health when he was cut by the defendant; the doctor was called and treated him and saw him three or four times before his death; the doctor left some tablets to give him and he took several of them to

ease him down when he was suffering; we gave him some the day he died; I do not know how many, I gave them as the doctor prescribed them to ease him; he was conscious until he died; there was no discoloration of the skin, it was normal; Mr. Sherfield was 50 years of age and his weight was 245 pounds; he was in good health."

Her testimony was, in substance, the same on cross-examination as in her direct examination.

John Foster was called as a witness and testified with reference to a conversation he had heard the defendant have with Wayne Boone, the day of the trouble at night, and stated the defendant seemed to be in a bad humor; "I could tell from the way he talked; he is an Indian and does not talk very plain."

Wayne Boone also testified to seeing the defendant in Wilburton on the day prior to the trouble at night, and stated the defendant seemed to be in a bad frame of mind; "the defendant told me that Mr. Sherfield was to meet them but did not; it was raining and the defendant was sore about it; Mr. Sherfield lived on my place."

Walter Mitchell testified he saw the defendant on the streets at Wilburton; "he asked me to take him out to Mr. Sherfield's home; I told him I could not go but would probably see some one in town who would take him out; he said Mr. Sherfield was supposed to meet them there but the son of a bitch did not come, that he would find out when he got out there why he did not come for them."

Walter Norman testified that on January 18, 1927, he was living on the Wayne Boone place in Latimer county—

"I knew Elliott Baker, and also J. W. Sherfield in his lifetime; I am J. W. Sherfield's son-in-law; on January

18, 1927, I was living about two hundred yards from Sherfield, on the opposite side of Gaines creek; about 7 or 7:30 that night Elliott Baker and his wife and baby came to my house, he was carrying two suit cases; they remained a few minutes and I took a lantern and helped them across the foot log; about 30 or 35 minutes later I saw him at the Sherfield home; shortly thereafter I went with Roy Sherfield to the Sherfield home; I went in the house at the east room and set down in a corner on some pine; the defendant Baker was there, when I went in he was sitting down; he got up and said, 'You have help now, I am ready for you'; Mr. Sherfield and I said about the same time, that I had come to see the baby; the defendant then told his wife to get her wraps, they were going home, 'they are mad at us'; Mr. Sherfield said there was nobody mad; the defendant again told his wife to get ready, they were going, and Mr. Sherfield said, 'if there is nothing else will do you, there is the door, hit it'; Mr. Sherfield was standing up at the time; Elliott said, 'Make me,' and started toward him; Mr. Sherfield shoved him back and when Elliott came back to him he cut him on the left side; I don't know whether Mr. Sherfield hit him or not, or what you would call it, he sorty hit him that way (indicating with his hand); Elliott Baker came toward Mr. Sherfield before Mr. Sherfield hit him or shoved him back; I did not see just what he did at the time they made that play, I got back behind Elliott and grabbed his arm; we scrambled around in the house and I took the knife away from him, they got the door open and I shoved him out in the yard; his wife told him no one was mad at him; after we shoved him out we closed the door and Mr. Sherfield laid down on the bed; I went after Sherman Walden; I asked Mr. Sherfield if he wanted Mr. Walden to go for a doctor, and I went for Mr. Walden who lived about a quarter of a mile away; the defendant Baker was there when I got back; he asked me if we were going after the law and I told him 'No'; Sherman told him he was going to see how Mr. Sherfield was; I gave the knife back to Elliott; he told me to get his hat and his knife and he would go home; he went away

in a few minutes; Florence Sherfield and I went to help him across the foot log and then went back to the house; I did not see Mr. Sherfield have a pistol, nor did I see him reach in his bib overall pocket; I did not see him have a knife; I did not see him offer to hurt Elliott Baker in any way."

On cross-examination, witness stated that defendant and his wife came by his house before they came to the Sherfield home—

"I helped them across the foot log; it was drizzling rain; I went back home and sat by the fire awhile before going to bed; my house is right on the bank of the creek; it was about 100 or 150 yards from the creek to the Sherfield house."

Witness, in substance, stated the same facts on cross-examination as he did on his direct examination as to what took place in the house and what was said by each of the parties before the difficulty started when the defendant cut the deceased with a knife.

Dr. E. B. Walker was called on behalf of the state, and testified to being called to see J. W. Sherfield on the 18th day of January, 1927—

"The deceased had a cut about three inches long I believe it was; I dressed his wound and sewed it up; I took, I think, three stitches; I saw him two or three times after that; I was to see him the morning before he died that night; I don't know what hour he died; blood poison was the cause of his death; he got an infection from the wound; the wound was the cause of his death."

On cross-examination witness stated he was at the Huskins Drug Store in Wilburton when he received the call to go see the deceased, Sherfield—

"I cleaned the wound and saw the shape it was in; I saw he was not bleeding through the wound and did not

think it was necessary to probe the wound; the wound was on the left side about two inches below the heart; it had been so long I had to study to think which side the man was lying on before I could tell which side it was on; it was about two years ago; I attended the deceased three or four times before his death; if the deceased had any chills or high fever I never heard of it; if there was any pimples or blisters inside his arm I never saw them; there was none on his chest so far as I know; I don't know whether his spleen was enlarged or not; I did not think where the cut was in his side it was necessary to examine his spleen; I did not have any blood culture made; I had seen the symptoms; there is different kinds of blood poison, some have chills and high fever, and some do not have any fever; I don't remember making a statement at Mr. Pate's place, in the presence of Mr. and Mrs. Pate, that the deceased did not die from the effect of the wound; that he must have died from peritonitis; I don't remember that I made such a statement, I would not say I did; I prescribed and left a lot of five grain acetanilide tablets to give Mr. Sherfield, it was a sort of a compound, I think their denomination was five grains, I had them in my case; five grains of acetanilide and sodium bromide; he was to take them every four hours; I also left him some zinc sulpho carbonite; they were white tablets; the acetanilide tablets were also white."

Sherman Walden testified that on the 18th day of January, 1927, he was over to J. W. Sherfield's home—

"The defendant was there; it was 9, 9:30, or maybe 10 o'clock in the night; the defendant was standing out in the yard; when I went up he asked me if I was going after the law and I told him 'No,' that I was going to see how bad the old man was cut; he made me feel of his head; he acted like he was mad; he said he come there to kill the old son of a bitch, and I asked him what was the trouble and the defendant said, 'I had to walk and carry the baby across the mountain in the rain'; the defendant then said, 'I want you to get the law, jail is my home anyhow.'"

On cross-examination the witness, in substance, stated the same as he had stated on direct examination as to the statements made by the defendant when he went to the home of the deceased.

John Sherfield, called as a witness, in substance, stated:

"J. W. Sherfield was my brother; I was at his home on the 22d day of January, 1927, and remained there until J. W. Sherfield died; he was groaning and taking on and complained of the cut the boy made with the knife; there was no discoloration of the skin that I could see."

On cross-examination, witness stated he saw no blue spots or pimples around the chest or abdomen—

"I did not see the wound, it had a plaster over it; it was not discolored around where the plaster was; I could not say his fever was high; he was not delirious; I did not give him any medicine; I did not pay very close attention as to what the examination of the doctor was."

Mrs. Mary Sherfield was recalled and asked if she had a daughter named Florence, and answered that she did, that Florence was a sister of Mrs. Elliott Baker.

On behalf of the defendant, Mrs. Annie Baker testified he was her husband; that on the 18th day of January, 1927, they went to the home of her mother, Mrs. Sherfield, who was the wife of J. W. Sherfield; she had been married to the defendant five years—

"I was living with my mother at Spiro when I married; at the time my mother was married to J. W. Sherfield I was about ten years old; it had been some time since I had visited them; the last time I visited them they were living at Mr. Cathey's place. It had been just about a year previous to the time I made the visit in Jan-

uary, 1927, that I had visited them; the day my husband and I came over to Wilburton we sent a phone message to my mother; we left Wilburton about 4 o'clock and walked out to where my mother and stepfather was living on the Wayne Boone place; it was about ten miles across the mountain; we arrived at the Sherfield home about 9 o'clock; my husband holloed and they finally came and opened the door; we went in and my husband asked why they did not meet us, and my mother said they did not get the message until about 4 o'clock, they had been hauling wood; my husband asked if they got the letters and cards; they kindly quarreled; my sister and mother went in and set supper and I went in to eat; they asked Elliott to eat but he said he did not want any thing to eat; my stepfather came in and tried to put his arms around me, and tried to love me, and said, 'What about it?' and when I went in I stooped down and told my husband, and he said for me to get my wraps and let's go, and Mr. Sherfield said, 'You have got to settle this trouble before you go'; I was putting on my wraps; Walter Norman came in after I came out of the dining room and told my husband what the deceased said to me in the dining room; Norman sat down on some wood by the fireplace; at the time Elliott was sitting kindly in the corner; Mr. Sherfield was next to the kitchen door; when Mr. Sherfield said, 'You have got to settle this,' Elliott started to get up and Mr. Sherfield hit him over the left eye with his fist; then they commenced scrambling around and my stepfather drew a gun on Elliott; he got his gun from the bib of his breeches or pocket, I could not tell; when Mr. Sherfield drew the gun I ran in between them; I had on my wraps and my baby was in my arms; the suitcases were standing by the front door; when Mr. Sherfield hit Elliott he and Elliott got into a fight; after Mr. Sherfield drew the gun and I ran in between them, Walter Norman put Elliott out of the door; when I ran in between them Elliott made some kind of a round, I don't know just what he did; when Elliott made this play around, Walter Norman grabbed him by the arms and put him out of the door."

A number of questions were asked and answered with reference to the deceased carrying a gun and when persons came to the house and holloed at night he would take a gun to the door with him.

The defendant then offered to prove the deceased had on various occasions prior to the trouble made improper proposals to his wife, some before her marriage and some after, which offer was denied, and the defendant excepted.

The cross-examination of the witness as to what took place in the room from the time she and her husband arrived at the home of the deceased was practically the same as her testimony on direct examination.

A. B. Kollins testified his profession was embalmer, and that he prepared for burial the body of the deceased, Sherfield. Witness then stated he paid no particular attention to the wound in the side of the deceased; that he took about two gallons of fluid from the body, which was a greyish green color. Witness further stated, when a person died from blood poisoning or septic poisoning, sometimes there will be discoloration around the wound and on the body, but you cannot be certain; you cannot always tell whether a person died with peritonitis, as there is always gas on the stomach, no matter from what cause a person dies.

Dr. J. N. Harris testified for the defendant, and was asked a hypothetical question showing the condition of the deceased's body, and in answer stated:

"The case presenting such a state of facts as indicated, I could in no way diagnose it as blood poisoning or streptococcus septicemia."

The doctor, after having been asked several questions as to what kind of medicine had been administered to the deceased, was then asked the following question:

"Under these conditions named, the deceased having gone to bed after receiving the wound, and remaining there five days, and then dying, being in his usual health, was the wound the proximate cause of his death, the contributing cause of his death, not a question of whether or not he had blood poisoning?"

And the doctor answered:

"It would seem under conditions of that kind, the man being healthy, normal up to that time, it would seem that the wound in a material way was responsible for his death."

On further cross-examination, the doctor was asked, "If the symptoms that have been outlined to you, can these symptoms satisfy your mind that he died from blood poisoning from the effect of the wound?" and he answered, "I can't think so." The doctor was then asked: "If he died from acetanilide poisoning wouldn't there have been discernible a very marked discoloration of his lips and face? A. There would have been discernible a cynosis blueness which would have been easily discernible. Q. Could that have been easily seen? A. Yes, sir."

J. M. Pate testified that the night Mr. Sherfield died Dr. Walker stayed all night at his place; that Dr. Walker made a statement at the breakfast table that Mr. Sherfield died with acute peritonitis—

"I do not remember all the conversation, did not think much about it; the day before this statement was made he got a thermometer from me and returned it the same day about 4 o'clock in the afternoon."

On cross-examination, witness was asked with reference to his feeling toward Dr. Walker, and stated that he and Dr. Walker had had some little trouble, and he paid a fine for having a fight with the doctor. Other witnesses were called to show that Dr. Walker made the

statement that Mr. Sherfield died of peritonitis. J. A. Blalock was asked as to whether or not Mr. Sherfield was addicted to the use of liquor, and stated he had seen him when he was drinking, and that the deceased has discussed with him his custom of carrying a gun. This conversation took place while the deceased lived a neighbor to him.

Duke Stallaby stated, in substance, that he saw the defendant on the 19th day of January, 1927, at the Commercial Hotel, in Wilburton; that the defendant had black spots on his face and on his right eye; that the defendant went home with him to Red Oak that day. On cross-examination, he stated the spots did not amount to much, but that one could easily see them.

Emeline Stallaby, Charley Baseden, and John Bramlett, in substance, testified to having seen the defendant the day after the trouble and as to the discoloration on his face and eye. This is, in substance, the testimony of the state and the defense.

The defendant has assigned and argued 11 errors alleged to have been committed by the court in the trial of his case. There is no conflict in the evidence, which tends to show that prior to the night of the difficulty the defendant was in good health, and was at home with his family when the defendant and his wife arrived at the home of the deceased; that, after they arrived at the deceased's home, a controversy arose between them, and the defendant contends the deceased struck him and started to draw a pistol on him when he cut the deceased with a knife.

An examination of the information in this case shows that it stated facts sufficient to charge the defendant with

the crime of murder. The defendant urges that the proof of the state failed to show that the defendant used a deadly weapon, that a knife is not, per se, a deadly weapon, and cites Collins v. State, 22 Okla. Cr. 203, 201 Pac. 285, 30 A. L. R. 811, to sustain his contention.

Volume 8 R. C. L. 289, § 310, defines a dangerous or deadly weapon, and among other things it says, under a statute against carrying concealed weapons, a knife was held to be a deadly weapon. The evidence shows conclusively that the defendant cut the deceased with a knife. The testimony of the eyewitnesses tends to show what took place at the time of the difficulty.

It is further urged by the defendant that the wound inflicted on the deceased was only a flesh wound, and that the testimony fails to show that the wound was the proximate cause of the death of the deceased. Dr. J. N. Harris, who testified on behalf of the defendant, admitted that, under certain facts detailed in a hypothetical question to him, by the county attorney, the wound inflicted upon the deceased undoubtedly contributed to and hastened the death of the deceased. The evidence tends to show the condition of the deceased's health was good prior to the time the wound was inflicted, and that he went to bed that night and remained in bed, except he was up for a few minutes a couple of times prior to his death, and tended to show that the wound was the proximate cause of the death of the deceased. When considered in connection with the evidence of his good health at the time the wound was inflicted, and the testimony of what took place at the time of the difficulty, while conflicting, the evidence is sufficient to sustain the verdict.

The defendant contends that the trial court erred in giving instruction No. 11, which is as follows:

"You are instructed that there is no evidence in this case showing or tending to show that the homicide in this case was excusable homicide, and this degree of homicide will not be defined to you further than to say that it is a certain kind of accidental killing."

This instruction is one that is usually given by the trial judge when it is apparent from the testimony that the alleged killing is not an accidental one, and where there is no testimony to warrant the court in submitting an instruction on accidental killing. This court has repeatedly held that it is not necessary for the trial court to define or instruct the jury on any degree of homicide not in the case. Newby v. State, 17 Okla. Cr. 291, 188 Pac. 124.

Section 2722, C. O. S. 1921, provides:

"In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict."

It is apparent that instruction No. 11 did not in any way mislead the jury as to its duty in this case.

It is next contended by the defendant that the court erred in refusing to give requested instructions 5 and 6; instruction 5 being as follows:

"Before the defendant can be convicted in this case, the state must prove beyond a reasonable doubt that the wound inflicted was in itself a mortal wound, for where the wound or injury is not in its nature mortal and not in itself such a wound as would likely produce death, the state must prove, beyond a reasonable doubt, that the deceased died as a result of septic poisoning, occasioned by the wound and in this connection, you are instructed that if, from the evidence, you believe, or have a reasonable doubt thereof, that death resulted of the improper treatment of the wound by an attending physician or surgeon or that death was caused by medical mistreatment of the

wound and not the wound itself was the sole cause of his death, then the defendant should be acquitted."

Instruction No. 5 was properly refused, as it is apparent from the instruction that it does not properly state the law. In Harrison v. State, 18 Okla. Cr. 403, 195 Pac. 511, the court, in stating the rule, cited with approval, 21 Cyc. 700, which is as follows:

"If a wound or other injury cause a disease, such as gangrene, empyema, erysipelas, pneumonia, or the like, from which deceased dies, he who inflicted the wound or other injury is responsible for the death. * * * He who inflicted the injury is liable even though the medical or surgical treatment which was the direct cause of the death was erroneous or unskillful, or although the death was due to negligence or failure by the deceased to procure treatment or take proper care of the wound."

It is sufficient if the wound inflicted on the deceased was the proximate and contributing cause of his death.

Instruction No. 6 is as follows:

"You are instructed that unless you believe from the evidence beyond a reasonable doubt that the deceased came to his death as a result of the wound and that death was not caused by independent or intervening causes occasioned by gross mistreatment by a physician or from other causes not superinduced by the wound, then you should acquit the defendant."

The general instructions of the court sufficiently covered the law requested by the defendant in his fifth and sixth instructions, and substantially advised the jury as to the law applicable to the facts in the case.

It is urged by the defendant that this case should be reversed on the ground of variance between the proof and the allegations in the information, relying on Elliott v. State, 4 Okla. Cr. 224, 111 Pac. 820, 140 Am. St. Rep.

683, to sustain his contention. An examination of Elliott v. State, supra, relied on by the defendant, clearly shows it is not in point. In this case the allegations in the information allege an assault on the deceased with a knife, and then state that the defendant cut the deceased with the knife, inflicting a wound upon the body of the deceased which caused his death. There is no fatal variance between the allegations in the information and the evidence offered in support of the allegations.

After a careful reading and study of the evidence contained in the record, we hold that the corpus delicti is sufficiently established, that the defendant was accorded a fair and impartial trial, and that the evidence is amply sufficient to support the verdict and judgment.

No errors appearing in the record of sufficient merit to warrant a reversal, the judgment is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.