THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RÓMULO SERBIÁ BONILLA, Defendant and Appellant.

No. 15386. Argued June 22, 1953.—Decided September 25, 1953.

*Rafael V. Pérez Marchand* and *Santos P. Amadeo* for appellant. *José Trías Monge, Attorney General,* and *Rafael L. Idrach Yordán, Assistant Fiscal of the Supreme Court,* for appellee.

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

The defendant was accused of murder in the first degree. He was tried by a jury and convicted of murder in the second degree. Thereafter, he filed a motion for a new trial predicated on the refusal of the trial court to instruct the jury as to manslaughter. This motion was denied and the trial court sentenced the defendant to 10 to 12 years in the penitentiary.

The defendant was also charged with carrying a prohibited weapon. The latter charge was tried together with the murder charge. The trial court found the defendant guilty of carrying a prohibited weapon and sentenced him to 6 months in jail.

The defendant appealed from both judgments. Several months later, the defendant filed a second motion for a new trial in both cases on the ground that one of the two stenographers who had taken part of the testimony at the trial had died. This motion was likewise denied and the trial court directed the defendant to present a statement of the case pursuant to § 356 of the Code of Criminal Procedure, 1935 ed., based on the very detailed notes which the trial judge took at the trial. The statement was prepared by the defendant "under protest". It was approved by the trial court and is part of the record on appeal.

The first assignment is that "The trial court erred in refusing to instruct the jury on manslaughter in spite of the fact that sufficient testimony had been adduced at the trial to justify the instruction."

The instruction which was requested by the defendant and refused by the trial court reads as follows: "That testimony having been adduced that the defendant made known to his friends, in coming out of his house, (*res gestae*) that an accident had occurred—testimony of Víctor M. Casals, witness for the People—and that he asked for help because he had wounded his wife accidentally and wanted an ambulance—testimony of Aida Isabel Benliza—a verdict of involuntary manslaughter is justified." [1]

---

[1] Section 203 of the Penal Code, 1937 ed., reads as follows:

"*Manslaughter Defined.* Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"1. *Voluntary.* Voluntary—upon a sudden quarrel or heat of passion.

"2. *Involuntary.* Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection."

The testimony of the People showed that the defendant and the victim lived together: that on December 31, 1950 at the stroke of midnight shots from a revolver were heard and the defendant came out into the street from his house, saying to several friends: "I have just killed my wife", "I swore that I was going to kill her at midnight and at midnight I killed her"; that as his friends did not believe him, the defendant then "pulled a revolver out of his right pocket" and displayed it. At the same time, he went toward the house of his friend, Víctor Miguel Casals López, who had already notified the police by telephone; that the defendant, once he was in Casals' house, told the latter, without going into details "that an accident had occurred in his house and that his wife was wounded".

An autopsy on the victim showed two bullet wounds, one of which entered through the fifth left space between the ribs and went through the heart, this wound being the cause of her death. The other bullet passed through the hip bone and remained under the skin of the left hip. The testimony of the People also showed that a revolver was seized which the defendant kept in a drawer and which had three expended bullets and two "duds".

Aside from testimony that the defendant was an insular policeman from 1919 and had never had any charge preferred against him, the only evidence offered by the defendant was the testimony of Angel Borrero and of Aida Isabel Benliza de Nieves. The former testified that on the night in question the defendant was pacific and that a few moments before he had sold the defendant bottles of rum and soda.

Aida Isabel Benliza de Nieves testified, according to the statement of the case, as follows:

"I went out on December 31 to take a walk and they greeted me and invited me to come in and I went into their house and I asked permission and from about 9 to 11 I was in the defendant's house. The atmosphere was agreeable. They recited poetry; he danced with my daughter (15 years old). I saw

nothing in the atmosphere. At midnight I was in my house. I had been at a small dance. At 11:45 my family was together. When 12 o'clock sounded, we greeted each other. I went out on the balcony and Serbiá's wife threw water in the street, which went on my brother's car. I went inside. She was very contented and happy. My husband is a newspaperman and he works at 'El Mundo'. After I entered from the balcony and I went out again and I saw all the neighbors together and Serbiá was standing there and he said 'My God, help me, I think I have killed my wife.' We went down and my husband asked the defendant and the latter said: 'An accident, I believe I have killed my wife, call an ambulance.' I know Enrique Quiñones. I did not see him there at that time. I did not see the defendant congratulating Enrique and putting his arm around him. Before I went down they were already saying that he had killed his wife, I heard Quique and I told him to go and see and he found the door closed and he said he would break it down and he broke it down, and he was astonished and said yes with his head. I did not see Serbiá go into the house again. He made no indication or demonstration that he was armed. I did not see this revolver. The police came. He told my husband 'You are a newspaperman, and I will tell you later'."

To support his thesis that the trial court should have instructed the jury as to involuntary manslaughter, the defendant relies on the testimony of Víctor Miguel Casals López that, immediately after the death of the deceased, the defendant told him "that an accident had occurred in his house and that his wife was wounded". He also relies on the above-quoted testimony of Aida Isabel Benliza de Nieves.

Undoubtedly, in a murder case the trial court must instruct the jury as to manslaughter *if there is some evidence in the record which would justify a verdict of manslaughter.* People v. Galarza, 71 P.R.R. 520; The People v. Alméstico, 18 P.R.R. 314; People v. Carrión, 35 P.R.R. 828. Even if this evidence is slight or weak, it must be weighed by the jury, not by the court. On the other hand, the trial court may not give instructions as to manslaughter.

if the record is barren of testimony which would support such a verdict. Annotations, 21 A.L.R. 603; 27 A.L.R. 1097; 102 A.L.R. 1019; 3 L.R.A. (N.S.) 1153, 1160. To permit the latter practice would be in effect to enable the jury to impose punishment different from that prescribed for the offense which was in fact committed. *Spart and Hansen* v. *United States,* 156 U.S. 51, 64 (1895).

The defendant argues that the testimony of two witnesses quoting the defendant as stating that an "accident" had occurred required the trial court to instruct the jury as to manslaughter. We cannot agree. We begin by pointing out that the word "accident" may be used as a label for two different sets of facts which in turn call for different legal conclusions. First, an "accident" could occur which, under the facts, if any had been presented by the defendant and believed by the jury, would require acquittal. Second, the word "accident" could also be used as the generic characterization of different facts which, if they were in the record, would establish a case of manslaughter. *State* v. *Bartley,* 84 S.W.2d 637 (Mo., 1935); *Glover* v. *Commonwealth,* 83 S.W.2d 881 (Ky., 1935).

In stating his theory at the trial, the defendant was apparently of the view that the testimony would show that the first type of "accident" had occurred, entitling him to acquittal. [2] That question is not before us, as the defendant no longer insists on acquittal. The defendant now urges that the facts which are actually in the record, as distinguished from what he asserted in his theory, required instructions as to manslaughter.

We reject this contention because there are no facts in the record to support it. It is true that, according to Víc-

---

[2] The theory of the defendant, according to the statement of the case, was that "The defendant and his wife, the alleged victim, were both drunk. They spent the day celebrating the arrival of the new year. She objected to his shooting his gun to say goodbye to the old year, as she wanted to do it, and thus her death occurred accidentally."

tor Miguel Casals, the defendant stated "that an accident had occurred in his house and that his wife was wounded"; and, according to Isabel Benliza de Nieves, the defendant stated "My God, help me, I believe I have killed my wife", and "An accident, I believe I have killed my wife, call an ambulance." But to state that an "accident" has occurred is to state a conclusion. And that conclusion—whether an accident occurred—is for the jury, not the witnesses or the defendant, to draw. To justify a conclusion by the jury that the death was due to an accident of the type which constituted manslaughter, it was imperative that the record contain at least some evidence, no matter how sparse, indicating the facts or circumstances constituting the alleged accident. Here there was no such evidence; the only thing in the record is the statement of the defendant, through the witnesses, labelling the killing as an "accident".

*People* v. *Carrión*, *supra*, relied on by the defendant, is distinguishable. In that case there was a conflict of evidence. A witness for the People testified that he saw the defendant point a pistol at the deceased; other witnesses heard the defendant exclaim: "Oh, God, what have I done!" But, for our purposes, the vital testimony was that of a witness for the defendant who testified that the defendant was handling a pistol when the shot took place; that she did not see the defendant point the pistol; and that if the defendant had pointed the pistol she would have seen it as she was looking.

The theory of the defendant in the *Carrión* case was that the defendant, a prison guard who customarily carried a pistol, accidentally discharged the pistol while handling it. We held there that under the circumstances the evidence required instructions to the jury on manslaughter as well as murder. But in that case there was evidence on which the jury could base a finding of manslaughter; *i.e.*, the testimony of the girl who saw the defendant when the shooting occurred and who swore that he was not pointing the pistol.

Here, as we have seen, there are no facts as to any accident. In the absence of such testimony, the trial judge would not have been warranted in permitting the jury *to speculate* as to the facts which constituted the accident and which, if they were in the record and were believed by the jury, might conceivably justify a verdict of manslaughter. Accordingly, the trial court did not err in refusing to instruct the jury as to involuntary manslaughter. [3]

■ The second assignment is that the trial court erred in not granting the motion for a new trial on the ground that one of the stenographers who took part of the testimony had died before he transcribed his notes, making it impossible for the defendant to perfect his appeal. The defendant did not appeal from the order denying the motion for a new trial. We therefore cannot consider this assignment of error. *People* v. *Millán*, 66 P.R.R. 233, 248, and cases cited. On the merits of this question, *cf. Carrión* v. *Sampedro et al.*, 74 P.R.R. 385.

The judgments of the former district court will be affirmed.

Mr. Justice Marrero did not participate herein.

---

[3] See § 247, Code of Criminal Procedure, 1935 ed., reading as follows: "Upon a trial for murder the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter or that the defendant was justifiable or excusable."

In *Newby* v. *State*, 188 Pac. 124 (Calif., 1920) the court pointed out at p. 128: "As heretofore repeatedly held, we deem the law to be that, if there is even slight evidence which tends to reduce the degree of the homicide from murder to manslaughter in either of its degrees, the trial court should give the defendant the benefit of any doubt which the evidence may suggest, and instruct upon such lower degrees. However, the court is not required to delve into the realms of conjecture or speculation in order to instruct upon some theory of the case not reasonably supported by the evidence."