## CLIFTON COPE v. STATE.

No. A-3853. Opinion Filed March 27, 1923.

(213 Pac. 753.)

(Syllabus.)

1. **Larceny—Unnecessary to Allege Property Taken Without Consent of Owner—"Steal," as Used in Information, Defined.** In an information charging the theft of live stock, based upon section 2116, Comp. St. 1921, a specific allegation that the property was taken without the consent of the owner is unnecessary. The word "steal" in the information has a uniform signification in common as well as in legal parlance; it means the felonious taking and carrying away of the personal goods of another; it means to take without right, secretly, and without leave or consent of the owner.

2. **Trial—Limit to Number of Impeaching Witnesses and Character Witnesses.** Ordinarily, it is within the discretion of the trial court to limit the number of impeaching witnesses. The number of character witnesses that may be permitted to testify will be governed by the circumstances in each particular case.

3. **Same—Arbitrary Limit on Number of Witnesses on Particular Issue Disapproved.** It is bad practice by a fixed rule of court to arbitrarily limit the number of witnesses who may testify to a particular issue. Such a rule precludes an exercise of discretion.

4. **New Trial—Larceny—Conviction Based on Witness Partially Impeached—Showing of Newly Discovered Evidence.** Where a verdict of conviction of larceny rests largely upon the testimony of a witness who has been partially impeached, and a showing is made of newly discovered evidence tending to establish that the property in issue was acquired in good faith, an

application for a new trial under the circumstances here should have been granted.

Appeal from District Court, Beaver County; Arthur G. Sutton, Judge.

Clifton Cope was convicted of the larceny of domestic animals, and he appeals. Reversed and remanded.

D. W. Buckner and C. H. Mauntel, for plaintiff in error.

The Attorney General, and E. L. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J. Clifton Cope, plaintiff in error, here referred to as the defendant, was by information charged with the theft on June 1, 1917, of two red heifers, one dark and one light red with white spot in forehead, about two years old, branded "P. S." on left hip, the personal property of Bernardine Wiles and Ray Over. At the trial, April 10, 1920, the jury found the defendant guilty as charged. After the defendant filed a motion for a new trial, which was overruled, the court pronounced judgment on the verdict, fixing his punishment at confinement in the penitentiary for a term of five years. From this judgment defendant appeals.

The information charged in substance that the defendant unlawfully and feloniously, by stealth and fraud, did take, steal, and drive away two red heifers (describing them), the property of Wiles and Over, of the value of $100, with the unlawful, fraudulent, and felonious intent on the part of the defendant to deprive the owners of the property and convert the same to the use of the defendant. There is no specific allegation to the effect that the property was taken without consent of the owners. The sufficiency of this information was challenged by demurrer, on the hearing of which it was urged that the information was fatally defective, in that it con-

tained no specific allegation that the property was taken without the consent of the owners.

To assume that one could "steal" the property of another with his consent would be stating a contradiction of terms—as much so as it would be to allude to an "honest thief," an "innocent robber," or a "virtuous harlot." The subject of such terms cannot be so limited or qualified without destroying the meaning of the term itself. In some of the cases decided by this court it was inadvertently held that it was necessary in an information charging the larceny of live stock to specifically allege that the property was taken without the consent of the owner, but these decisions have been expressly overruled. In the case of Underwood v. State, 23 Okla. Cr. 119, 212 Pac. 1010, decided May 16, 1922, Judge Matson, speaking for the court, said:

"The word 'steal' has a uniform signification in common as well as legal parlance; it means the felonious taking and carrying away of the personal goods of another; it means to take without right, secretly, and without leave or consent of the owner. In the special larceny of live stock statute making it a felony to 'steal' certain live stock, there being no language in the act to indicate that the Legislature intended to place a different meaning upon the word 'steal' than that given to it in its ordinary and legal sense, an information charging certain live stock to have been taken 'feloniously and by stealth,' with the further allegations that the taking was with 'felonious intent to permanently deprive the owner thereof and to appropriate the property to the use of the taker,' there is sufficient negation of the owner's consent to the taking. The cases of Beck v. State, 14 Okla. Cr. 3, 166 Pac. 753, and Yates v. State, 14 Okla. Cr. 10, 166 Pac. 904, in so far as in conflict herewith, are expressly overruled; the decision in Crowell v. State, 6 Okla. Cr. 148, 117 Pac. 883, is followed."

The conclusions reached in the Underwood Case and the reasons given therefor will be adhered to in this and like cases. This being true, we hold that the information in this case was sufficient.

There are several unusual features connected with this prosecution. It was charged that the larceny was committed June 1, 1917, by means of changing and altering the brands on the two animals in question. The prosecution was commenced 2 1-2 years later, December 3, 1919. The testimony discloses that in the meantime there was pronounced ill-feeling existing between the two prosecuting witnesses, on the one side, and the accused and a brother of the prosecuting witnesses, one Johnnie Over, on the other side, growing out of lawsuits concerning an estate in which all of these parties claimed an interest. Johnnie Over was the principal witness for the state and had been a close friend of the defendant, with whom he had lived much of the time for a number of years. Johnnie Over sold his interest, or a portion of his interest, in this estate to the defendant; a short time prior to the institution of this prosecution, he and the defendant became estranged over matters growing out of a settlement of this estate; prior to this estrangement Johnnie Over had not been on good terms with his brother and sister, the prosecuting witnesses in this case and the owners of the heifers in controversy. When the difficulty arose between the defendant and Johnnie Over, the latter informed his brother and sister that he was present when the defendant changed the brands and came into possession of the heifers alleged to have been stolen, which disclosure caused the brother and sister to institute this prosecution; about the same time a reconciliation seems to have been effected between Johnnie Over and his brother and sister.

Concerning the changing of the brands, as charged, Johnnie Over testified thus:

"Q. Now, did you ever have a conversation there at the time the branding occurred, or later, with the defendant, Clifton Cope, as to whom these cattle belonged? A. Yes, sir.

"Q. Just state to the jury what that conversation was. A. Well, I asked him, I says: 'You got a couple of fine heifers there. Where did you find them at? Where did you get them?' Something like that, and he says, 'Just keep your damn mouth shut.'

"Q. Did he tell you whose cattle they were?" A. "No."

No other person was present or knew about the alleged rebranding of these cattle. There was expert testimony introduced, tending to show that the brands appeared to have been changed, but nothing other than the testimony of Johnnie Over that would indicate that the accused made these changes. The defendant claimed that he purchased these cattle in good faith, marked with the brands as they were then and afterwards.

During the time intervening between the date of the alleged changing of the brands and the time Johnnie Over informed his brother and sister of the occurrence, a period of 2 1-2 years, the whereabouts of these heifers was unknown to the owners. It appears that the owners assumed that they had strayed away and no particular effort was made to locate or recover them.

The testimony of Johnnie Over was the keystone of the arch upon which this prosecution rested. If Johnnie Over's story was a fabrication, growing out of malice or hope of reward as is indicated by some of the testimony introduced, the testimony otherwise is wholly insufficient to support the verdict. In the course of the examination of witnesses for

the defendant touching upon facts connected with the case, four different witnesses testified that the reputation of Johnnie Over for truth and veracity in the vicinity and community where he resided was bad. The defendant sought to show by seven other witnesses that his reputation for truth and veracity, covering a period of eight years last past, was bad. The court refused to permit this to be done, stating:

"The offer is refused for the reason that the court has heretofore limited the parties to four impeaching witnesses on each side."

To this ruling of the court the defendant excepted. The witnesses who had testified that Johnnie Over's reputation for truth was bad were not in a strict sense impeaching witnesses, the testimony on that point being incidentally brought out during the course of the examination upon the facts and circumstances directly at issue.

Ordinarily, it is within the sound discretion of the trial court to limit the number of impeaching witnesses; but this is not always the case. In Green v. Phoenix Mutual Life Insurance Co., 134 Ill. 310, 25 N. E. 583, 10 L. R. A. 576, it was held that a trial judge should not arbitrarily limit the number of witnesses that might be called to establish a fact of controlling importance. In the case of Browder v. State, 30 Tex. App. 614, 18 S. W. 197, the defendant, after introducing four character witnesses in his behalf, was refused permission to introduce several others. It was held that the defendant had a right to prove his own reputation for honesty and truth, notwithstanding the fact that he had already successfully attacked the credibility of one of the state's witnesses; and that it was error to preclude him from the introduction of additional testimony upon the ground that such testimony was cumulative in character. Limitations as to the number of character witnesses that may be permitted to testify will

vary and should be governed by the circumstances in each particular case. In cases where the impeaching testimony relates to witnesses who testify to collateral matters more or less remote, the discretion of the trial judge in limiting the number of such witnesses will not be disturbed; but where, as in this case, the conviction rests wholly upon the testimony of the witness sought to be impeached, and no conviction could be sustained without his testimony, it is, in our judgment, clearly error to limit the number of impeaching witnesses to four. Nothing appears in this record, excepting the remarks of the court before quoted, to indicate that the trial judge had theretofore limited the parties to the introduction of four impeaching witnesses. Possibly this was a previously announced general custom known to the attorneys, but the manner of the announcement in open court, in the presence of the jury, to that effect, may have operated to the defendant's prejudice.

It is bad practice for the trial judge, at or before the beginning of the trial, to arbitrarily limit the number of witnesses that may testify to a particular issue. The limitation of the number of witnesses rests with the sound discretion of the court, to be applied in each particular case as the exigencies of that case may demand. To make an arbitrary rule in advance precludes the exercise of discretion. Williams v. McKee, 98 Tenn. 123, 38 S. W. 727; Larned v. Platt, 26 Ill. App. 278. In the latter case the court said:

"A general rule limiting the number of witnesses to the reputation of a witness for truth and veracity to a particular number in each case excludes the exercise of discretion and is unreasonable."

In the case of St. Louis, M. & S. Ry. Co. v. Aubuchon, 199 Mo. 352, 97 S. W. 867, 9 L. R. A. (N. S.) 426, 116 Am. St. Rep. 499, 8 Ann. Cas. 822, it was held that the matter of

limiting witnesses should be approached with caution. An arbitrary rule allowing but four witnesses to a side in a damage suit, upon the issue of damage or no damage, cannot be defended. There is a great difference between witnesses, however wisely they may be selected. The manner of some may be disappointing; their capacity to tell what they know may have been miscalculated; some may withstand a searching cross-examination, while others may not. Neither court nor counsel have the right to say in advance that justice may be met by an arbitrary assignment of four witnesses to a side on a vitally important controverted question.

There is another apparent weakness in the testimony produced by the state. The prosecuting witnesses at different times owned a large herd of cattle. They testified that early in the spring of 1917 they purchased 36 head of mixed cattle, from one Perry Spicer, all branded "P. S." excepting one bull; Spicer testified that he sold them 36 head of mixed cattle, all branded "P. S." excepting three, two heifers and one bull. This shows a discrepancy in the testimony as to the brands on the two heifers. Now, the prosecuting witnesses did not miss any particular cattle, or any cattle, except that at the fall round-up they could count but 33 head marked with the "P. S." brand, from which fact they say they concluded that they had lost two head of the cattle purchased from Spicer. But Spicer said that there were but 33 head marked with that brand in the lot he sold the prosecuting witnesses.

It is therefore reasonable to conclude that these prosecuting witnesses did not lose these two head of cattle at all, and that the cattle charged to have been stolen by the defendant, bearing a "P. S." brand when found in his possession, were not the property of the prosecuting witnesses, but were cattle purchased from another herd belonging to one Jim Randolph,

then deceased, as was claimed by defendant and corroborated to some extent by other witnesses. Upon this point defendant in his motion for a new trial set out that he had just been apprised of newly discovered evidence, to the effect that Barney Altman, Frank Blessing, and John Porter were present when Randolph branded a number of cattle, among which were two heifers which were branded "B. S.," and that these two animals were so branded because they belonged to Barney, the stepson of Randolph. This would have been important competent testimony, supplying a missing link in defendant's chain of testimony by explaining how the two heifers purchased from Randolph and found in defendant's possession were marked "B. S." This motion for a new trial was overruled and an exception taken.

On account of the weakness of the testimony supporting the theory of the state and the showing made that these absent witnesses could probably be procured at a later trial, and upon the diligence shown to procure the testimony which they could offer, considered all together, we think there was a sufficient showing for the granting of a new trial, and that in fairness to the defendant a new trial should have been granted.

It was shown that the defendant some time previous had been convicted of stealing a saddle; he may have stolen these two heifers, but we think the proof is far from conclusive that he did so.

On account of the insufficient probative force of the state's evidence, the refusal of the court to permit the further impeachment of the all-important witness, Johnnie Over, and the refusal to grant a new trial on the ground of newly discovered evidence, all considered together, the judgment of the trial court is reversed, and the cause remanded.

MATSON, P. J., and DOYLE, J., concur.