## COURTNEY D. ORRELL v. STATE.

No. A-10343. Jan. 3, 1945.

(154 P. 2d 779.)

Embry & Sutton, of Chandler, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Walter Hill, Co. Atty., of Prague, for defendant in error.

BAREFOOT, J. Courtney D. Orrell was charged in the district court of Lincoln county with the crime of murder; was tried, convicted and sentenced to serve a term of life imprisonment in the State Penitentiary. From this judgment and sentence he has appealed.

The defendant relies upon four propositions for a reversal of this case. They are as follows:

"1. The verdict is not supported by sufficient evidence. And the court severally erred: (a) In not sustaining plaintiff in error's demurrer to the evidence of the state in chief; (b) the court erred in not sustaining defendant's motion to direct a verdict of not guilty at the conclusion of all of the evidence; and (c) the court erred in overruling the motion for a new trial.

"2. The court erred in not instructing the jury as to manslaughter in the first and second degrees, and not instructing as to assault and battery.

"3. The court erred in limiting the number of witnesses as to the reputation of defendant.

"4. And the court erred in not sustaining defendant's objection to argument of counsel for the state, to the jury."

A consideration of the first assignment of error necessitates a short statement of the evidence.

In the early morning of August 18, 1941, the nude body of a young girl was found by the caretaker in the Oak Park Cemetery, just west of the city of Chandler, in Lincoln county. It proved to be the body of Billie Grayson, 18 years of age.

Upon examination by the officers and doctors, bruises were found upon her neck and body, and appearances which justified the belief that she had been choked or strangled. Her neck was broken. Her clothing and shoes were found near the body.

We have read the entire record carefully, and reread a great part of it, and have carefully examined the briefs submitted by the state and the defendant. The conclusion we have reached is the conclusion of an appellate court from the record before us, and the law as ap-

plied to the facts. It is obvious that in our duties as an appellate court we cannot act as if we were jurors, or the trial court.

Doctors testified that Billie Grayson had been dead since about midnight. The record revealed that Helen Grindstaff, 14 years of age, and Billie Grayson, 18 years of age, were neighbors, living near the town of Warwick, in Lincoln county. On Sunday, August 17, 1941, they spent the afternoon at their homes, and at the homes of friends. In the late afternoon, about dark, they went to U. S. Highway No. 66, and finally went to Warwick, on the highway. There they met a young man by the name of John H. Terrell, at a filling station, and got in his car and went to Chandler. Helen Grindstaff testified that they were looking for watermelons. They left Chandler and started toward Warwick, but the girls got out of the car at a filling station on Highway 66, and started walking west toward Wellston, the Grindstaff girl saying that she thought her father was there. This was about 10:30 or 10:45 at night. They walked west to the Pioneer Camp, which is located at a cut-off on the highway, just east of the town of Wellston. After arriving at this point, they decided it was too late to go on to Wellston, and turned back east on Highway 66, to go to their homes. They had gone but a short distance, according to the testimony of Helen Grindstaff, when a car drove up, and at the invitation of the driver, they got in the car. She testified positively at the trial that defendant was the driver of the car, and positively identified him. Reference will hereafter be made to her testimony in regard to the time they were picked up by defendant, and her previous testimony and statement with reference thereto. She testified that Billie Grayson and she both rode in the front seat with defendant, and that Billie Grayson was sitting next

to defendant, and she was on the outside. She described the car as a two-seated dark colored car, with a light, radio and clock on the dashboard. The radio was playing when they got in the car. She testified to the following conversation with the defendant:

"Q. Did you have any conversation at that time, you and Billie, with Mr. Orrell? A. We talked a little. Q. Do you remember what you talked about? A. He asked us did we want to go to Chandler with him, and we told him no, we thought we had better get home. He said it was 'a little far for you girls to walk, and I will take you home,' and he started out, and he asked us how far apart the houses were, and things like that. Q. Did he take you home? A. No, sir. Q. Where did he take you? A. On the other side of Deep Fork bridge, the south fork of Deep Fork bridge, under a pecan tree. Q. How did he get to that place from where you got in—which direction did you go? A. We went south. Q. You mean you went south from Warwick? A. Yes, sir. Q. You went east to the corner of Warwick and then turned south, is that what you mean? A. Yes, sir. Q. Across Deep Fork bridge, and what happened there? A. He stopped the car, and I started to get out, and holding the door open for Billie, but he grabbed her and drove off. Q. What did you do? A. I started running after the car. Q. You didn't catch the car, did you? A. No, sir."

This was the last seen of Billie Grayson until her nude body was found in the cemetery the next morning, as above stated.

To corroborate the witness Helen Grindstaff, the state first offered the testimony of Mr. and Mrs. Ralph Goggin. They were farmers living near the town of Wellston. Some time between 11 and 12 o'clock on Sunday night, August 17th, they left their home to meet the bus going into Wellston from the east. They were meeting someone who was to get off the bus at the Pioneer

Camp. While waiting for the bus, they saw two girls come to the Pioneer Camp, and then turn east, walking down the pavement. They also saw a car coming from the east, drive into the Pioneer Camp, turn around and start back east. Mr. Goggin did not see the car stop, but Mrs. Goggin testified that she saw the car stop right where the girls were, but she did not see them get into the car. Neither of these witnesses was able to identify the two girls, or the defendant, but both testified that the car was a dark colored sedan.

Jim Leake lived east of Chandler, and was an oil field pumper for the Magnolia Petroleum Company. He worked on Sunday night, August 17th, from 6 in the evening until midnight." After finishing his work, he drove through the Oak Park Cemetery on his way from work. This was his usual route home. As he approached the cemetery from the south, he saw an automobile driving north, from Highway 66 toward the cemetery. The cemetery was about 1,000 feet north of the highway, and the car was about halfway between the cemetery line and the highway. He testified that the car disappeared, going north into the cemetery. He observed the tag number of the car, but only "caught" the first number, which was "4." This number indicated the county in which the license had been issued, which was Pottawatomie county. This witness was himself driving a car the license to which had been issued in Pottawatomie county, and the first number of his tag was also "4." This witness also testified that the car he saw was a late model; that the light near the license plate illuminated it very distinctly, and that he observed that the color was dark red or maroon. The license number of defendant's car was 4-444, and it was a maroon, 1941 Super Deluxe Ford sedan.

The state also offered the evidence of two witnesses, Silas Lowery and Howard Anderson, both of whom were inmates of the State Penitentiary, and had been confined in the county jail of Lincoln county while defendant was in jail awaiting trial. Both of these witnesses testified to a conversation with defendant prior to his trial. Silas Lowery testified:

"Q. Will you please state to the court and jury just what statements he made to you with reference to this case? A. Well, me and Howard Anderson was sitting in the cell on the bunk. He came in and sat down on the other bunk, and me and Howard had been talking about our cases, and Howard said he hated to go to the penitentiary for something he didn't do. Orrell said, 'What would you do in a case like mine?' He said, 'I took the girls out, but I didn't kill her,' and he broke down and cried. Q. That is all the conversation you had? A. Yes, sir.

Howard Anderson testified:

"Q. Will you please state what that conversation was? A. We was sitting in the cell talking, me and Silas Lowery, and Courtney Orrell come in there, and I made the statement I hated to go to the penitentiary for something I didn't do, and he said, 'What would you do in a case of my kind? It looks like I am blowed up. I picked up those girls, but I didn't kill her; she killed herself,' and he broke down and cried, and we got up and walked out of our cells, and he went in his and broke down and cried. Q. Did you have any further conversation with Mr. Orrell about this case? A. No, sir, not about the case, only he told me not to say anything about it."

On cross-examination it was revealed that these witnesses did not testify at the first trial of defendant, which resulted in a hung jury, and that they told a deputy sheriff of Lincoln county about the above conversations after the trial. The defendant produced a number of

witnesses who testified that the reputation of these witnesses in the community in which they lived, for truth and veracity, was bad.

Other evidence was offered by the state, but it was with reference to the time element introduced in this case by the defendant in attempting to establish an alibi, and reference will be made to this evidence in considering the evidence offered by the defendant.

The defendant not only denied that he picked up Helen Grindstaff and Billie Grayson, as Helen testified, and that he did not kill Billie Grayson, but he attempted to establish an alibi. The facts as herein related will reveal that the time element of the alibi was very close. The defendant's own testimony places him in close proximity to the scene of the killing very near the time it must have been committed, as shown above.

Defendant testified that he was an oil field worker, that he was married and his wife was named Stella Orrell. He had a stepdaughter eight years of age. He lived with his brother-in-law, Dewey Embry, in an apartment in Oklahoma City on August 17, 1941. He had recently been engaged in helping to drill an oil well in Payne county for his uncle, H. R. Wayland, who was connected with the Kirk-Green-Way Oil Company. That just prior to August 17, 1941, the well had been completed, and he was out of work, and looking for a job. He had a brother living in Ohio who had written him that he had a job for him there at $1.12 per hour. He was making preparations to go to Ohio, if he could not secure work in Oklahoma. On Sunday morning, August 17, 1941, he heard of a job near Guthrie, in Logan county, and he and his brother-in-law, Dewey Embry, went to Guthrie, but the job was not open, and he did not secure

the same. They returned to Oklahoma City, and he loaded his car with his personal belongings, in preparation to go to his brother in Ohio. On that Sunday evening, he took his brother-in-law, Dewey Embry, to his work, on an oil well located east of Edmond, one mile south of the intersection of U. S. Highways 66 and 77. The brother-in-law was due at his work at 11:30, and they reached the well about 11:20 Sunday night. Defendant left the well to go to Chandler to get his employment pension check, which had been mailed to him in care of his mother-in-law, who lived in Chandler. The distance from the intersection of Highways 66 and 77 east of Edmond, to the Pioneer Camp, where Helen Grindstaff testified he had picked them up, is 22 miles. It will thus be seen how close the time element is, even according to the testimony of the defendant. His testimony as to the time of his arrival at the Edmond well and the time of his departure is corroborated by a number of disinterested witnesses. Defendant testified that he went direct to Chandler, going first to the Leffingwell gas station, where he purchased gas for his car. While there he saw several parties whom he knew. That upon obtaining the gas, he went to the home of his mother-in-law to get his employment pension check. That she was in bed, but informed him that she had mailed the check to him in Oklahoma City. Both he and his mother-in-law testified that he left there at 1 o'clock a.m., and that they heard the clock strike 1 just as he was leaving. He returned to Edmond and purchased sandwiches and coffee at a restaurant, and took it to the men at the Edmond well. That he then returned to Oklahoma City some time between 2 and 3 o'clock, went to the home of his brother-in-law, Dewey Embry, and there was no one at home. He drove around hunting for his wife, and returned to

the home about 3:30 and found her there. He was going to Shawnee to get a check from H. R. Wayland, his uncle, for work he had done on the oil well in Payne county, and wanted his wife to go with him. His wife refused to go, and he placed some of her clothing in his car, thinking that she would go with him, and they had some words, and he left for Shawnee. His uncle was not there, and he could not get the check due him, and returned to Oklahoma City the morning of August 18th, around 10 or 10:30. He called his wife over the telephone, and she advised him not to come to the home, as her sister-in-law had informed the police of his taking her clothing, and they had a pick-up order for him. He telephoned his wife again in the afternoon, and she and her brother met him at Eastern and Twenty-third street, and delivered the employment pension check, and he gave his wife her clothing, with the exception of one dress, which was overlooked. He then left for Ohio, going over Highway 66, passing through Chandler and Vinita, and cashing the employment pension check at Miami.

Defendant was later arrested in Sandusky, Ohio, and returned to Lincoln county, where he was charged with the murder of Billie Grayson on the night of August 17, 1941. He was returned to Oklahoma by Marvin Roberts, sheriff of Lincoln county, and Bob Turner, a deputy sheriff of Oklahoma City. They returned in the car of defendant, and in this car at the time of the arrival of the Oklahoma officers they found a copy of the Oklahoma City Times of Monday, August 18, 1941, which contained a write-up of the finding of the body of Billie Grayson. The officers talked with the defendant and he at no time made any statement to them that would implicate him in the murder of Billie Grayson. He re-

turned to Oklahoma without the necessity of an extradition.

Defendant's wife, Stella Orrell, was a witness in his behalf. She corroborated defendant's testimony as to the time he left Oklahoma City on the 17th day of August, 1941; as to his preparation to go to Ohio to look for work; that she assisted him in packing his things in the car; that her sister-in-law notified the police when he placed her clothes in the car, and of advising him not to come to the home, when he called her over the telephone. She testified positively that she knew he was going to Ohio to look for work, and that their relations were friendly. On cross-examination she denied that he had tried to force her to go to Ohio with him, and testified that he did not twist her arm, and did not threaten to kill her when he talked to her over the telephone, and denied that she spoke of his strange appearance when she talked with him. She identified a letter she had received from him, and this letter was introduced in evidence as a part of the cross-examination. It was as follows:

"Boston, Massachusetts
August 30th 1941

"Dearest Stella Pearl—

"I'll bet you never expected to hear from me from this section of the country did you? I'm just aimlessly wondering around looking for something to do and have several things in mind that if they pan out everything will be O.K. I hope. I have worried and wondered about you ever since I left Oklahoma City. How are you getting along and how are you lined up at present. I'd give a months pay right now to talk to you for just one hour. I'm going to show you that I can make good just because I know you think that I can't. I know that I've been an awful heel and have let you down plenty but if I can ever make the grade at all it will be now and if you haven't

already broken faith with me permanently by the time you get this I'll be on my way to doing something right for a change.

"My main idea for getting in touch with you is to straighten out some financial deals for me. I have twelve days pay coming that I want you to get from Poolie and make that $31.50 bank payment. Then you can get that $15.00 relief check from Chandler and give it and $36.00 to the O.K. Furniture Co. and get rid of them. In case the G.E. people haven't already repossessed the ice-box ask Dude if he'll pay that up and let me know what amount is necessary to get back in good standing with them. If you can take care of this for me I would appreciate it a whole lot for I'm not in a position to present myself just now. Tell Poolie that as soon as I'm located I'll get in touch with him and that although things look bad right now that I don't intend to let him down. I'm sorry that you are not out of the reach of my creditors for I know how they are going to pester hell out of you. I've firmly resolved to pay all my debts as quickly as possible and if I get the job I'm working on it won't take very long to get on top again. Did you ever file any more papers or withdraw that complaint that you had in against me? I hope so for I want to see you before too long. In case I get a job at $70.00 per week that will last quite a while would you leave Oklahoma to live with me again. School will be starting next week and I'm just wondering what you are going to do with Mary Lou. Every time I see a girl about her age or size I get the funniest feeling I've ever had. I know that she has a hell of an opinion of me but although most of it is justified I know I still have hers and your interest at heart. Really Stella, I love you more than anything in the world and would like to make you the happiest girl in the world but I know that things can't go on like they have and while I know your attitude on apologies I'm willing to apologize and try to start over where I got off on the wrong track if you will only let me. I'm only going to ask you for one more chance for I need your.

companionship and love to work for and I'm sure if you'll let me try again I'll profit by my mistakes and make you a good husband in every sense of the word. I've been so lonesome for the past two weeks that I've several times thought that I couldn't got on but I want to hear from you again and see how you feel about things. My present plans call for me to fly to Kentucky as soon as I hear from Marvin and meet him there for a couple of days and talk over a business deal so if you'll write me a letter addressed to Courtney D. Orrell, c/o Marvin C. Orrell, Rye Beach, Huron, Ohio, I'll get it with only about two days delay. That is, if you write back right away. I would give you my address here but I'll only be here two more days and then I'm going to head south again. I haven't any money to enclose in this letter but I'll send you some just as soon as I can. Tonight is Thursday night and I'd give anything to tune in KVOO and hear Bob Wills and the gang but my radio won't get them up here. This Ford is getting to be a pretty poor hotel and I've slept so much in the front seat that I feel like my skin is just about as rough as the seat covers. How are Dude and Belle getting along. Tell Belle that I'm going to write her a letter before long. Please write to me honey and tell me all the news for I'm practically lost up here by myself and there are lots of things you could tell me. Goodnight and I want you to remember that regardless of how bad I have behaved that I still love and honor and cherish you and want you to come home and make me a home and let me show you that I can be as much of a man as you are a woman. Thanks a lot and with all the love that a man can bestow on a woman I am still as you would like for me to be.

"Yours forever,

"Corky."

This letter purported to be sent from Boston, and indicated that the defendant was in Boston, and not in Ohio. Defendant testified that the letter was written in Ohio, and that he had never been to Boston, but that a friend of his mailed it for him in Boston.

On rebuttal police officers from Oklahoma City testified to conversations had with Mrs. Orrell after she filed charges against the defendant. One of these officers testified:

"Q. I will ask you to state, Mr. Maulding, whether or not at that time Mrs. Orrell told you that her husband, Courtney Orrell, had twisted her arm and tried to make her go out to the car and leave with him? A. She said he had pulled her from the porch or door out to the car, and showed us a bruise on her arm and said he twisted her arm. Q. State whether or not she said he was drunk and crazy? A. She said he was drunk, and either said he was crazy drunk, or drunk crazy, I don't know which. . . . Q. I will ask you if in that conversation she told you that he had called her from 23rd and Eastern and demanded she meet him out there and leave with him, and had said he would kill her if she didn't? A. Yes, sir. Q. I will change that: If she didn't say he would kill her before day? Q. Did she make that statement? A. Yes, sir. Before morning, is what she said."

Several other police officers corroborated the testimony of this officer.

With reference to the time element, on the question of an alibi, it will be noted that Helen Grindstaff testified that she thought the clock in the automobile showed 11:30. This, of course, was her best judgment.

Mrs. Goggin testified that she and her husband were at home "until along about 20 minutes—between 20 minutes to 12 and 12." And that they drove to the Pioneer Camp and saw the girls walking east on the highway. Mr. Goggin corroborated her testimony on this point.

Mae Turner, the bus agent at Chandler, testified that the westbound bus was due at Pioneer Camp at 11:21, but she did not know or have any record of the correct time it arrived there on the night of August 17, 1941.

The defendant testified that he left the Edmond well at 11:30 and that he drove to Chandler and went first to the Leffingwell filling station. That he remained there until shortly before 1 a.m., when he went to the home of his mother-in-law in Chandler, and that he left there at 1 a.m.

The state introduced a number of witnesses who saw the defendant in Chandler on Sunday night, and they testified as to the time.

Kenneth Miller worked at a filling station in Chandler. He got off work at 11 o'clock. He talked with some other fellows about an hour, and then went down to the Leffingwell filling station. He knew the defendant, Courtney D. Orrell, and saw him there at that time. His best judgment was that it was 1:30. It was 2 a.m. when he got home.

Emmett Rice testified that he came to the Leffingwell filling station between 1:15 and 1:45 on the morning of August 18, 1941. That he knew the defendant, and saw him at the filling station at that time. He fixed the time by looking at the courthouse clock as he went home, and it was 10 minutes until 2 o'clock. It was about four blocks to his home. Mrs. Rice, who was with her husband, saw the defendant at the filling station, and it was her best judgment that they were there at 1:30.

Leonard Heath worked at the Leffingwell filling station. He identified a ticket signed by the defendant for gas sold him on the night of August 17th, and stated that the defendant was there some time after 12 o'clock, but he could not state the exact time. He knew from the ticket that it was after 12 o'clock midnight.

Jim Leake testified to seeing a car with the first number, "4", of the license tag going into the cemetery

and as to the time, stated that "couldn't have been earlier than 12:20 or later than 12:30. It was within that ten minute period."

The route taken by the car after Helen Grindstaff got out of it, according to her testimony, and the time the car was seen by Jim Leake, entering the cemetery, between 12:20 and 12:30, remains a mystery. Billie Grayson is dead, and the defendant denies having taken her into his car.

This court had occasion to consider the question of alibi, and especially with reference to the time element thereof, in the case of Gregg v. State, 69 Okla. Cr. 103, 101 P. 2d 289, 295. In that case the court did not instruct the jury upon the question of alibi, and this was assigned as error. Here the court gave an instruction fully covering the question of alibi. Judge Jones, in writing the opinion, said:

"An examination of the defense testimony shows that the defendant had left the Fritts home and probably arrived back in Marlow before Garland Smith, the undertaker, left to go to the Fritts home, as there is no testimony on the part of the defendant or of Smith that they passed each other on the road. Smith says that he was at the Fritts home about 11 o'clock and stayed 15 or 20 minutes before driving back to town. Under the defendant's own testimony, he was in the immediate vicinity all during that day; and the trial court committed no error in holding that in view of the nature of the testimony given by the defendant's witnesses, and the indefiniteness with which they fixed the time, the evidence showed a 30- or 40-minute period in which the act could have been committed and that an instruction on alibi was not proper.

"The question of alibi is only incidental to the defendant's theory; the prosecutrix related a whole series

of acts covering a period of 18 months. The defense theory was that this story was a fabrication, false in its entirety and without any foundation. He and his witnesses offered testimony to support his theory; and the general instructions of the court thoroughly covered this phase of the case.

"This court will not hold that the trial court should give an instruction upon a so-called 'fifteen minute alibi' where all of the defendant's testimony shows that he was in the immediate vicinity where the alleged offense occurred.

"Alibi is a physical circumstance and derives its entire potency as a defense from the fact that it involves the physical impossibility of the guilt of the accused. Harris v. State, 120 Ga. 167, 47 S. E. 520.

"In the case of Barbe v. Territory, 16 Okla. 562, 86 P. 61, our court laid down the following rule:

" 'To entitle the defense of alibi to consideration, the evidence must be such as to show that, at the very time of the commission of the crime charged, the accused was at another place so far away or under such circumstances that he could not, with ordinary exertion, have reached the place where the crime was committed so as to have participated in the commission thereof; and, in a criminal prosecution, unless the evidence fills this requirement of the law, no instruction on the subject of alibi is necessary to be given by the trial court.'

"In the case of People v. Charles, 9 Cal. App. 338, 99 P. 383. the court held that it was not error to refuse to instruct on the defense of alibi, where the accused's proof did not show that he could not have been at the place of the offense at the time shown by the prosecution.

"The defendant, himself, did not know the time that he was at the various places during the day alleged offense occurred. All of the evidence showed that he was present in such close proximity to the place where the

offense is alleged to have been committed that we think the court's ruling thereon was proper."

As above stated, in the instant case the question of an alibi was presented to the jury by a proper instruction, and they were permitted to consider the evidence with reference thereto, together with all of the facts and circumstances.

Defendant's contention that his witnesses alone are correct in their statements as to "time," and that the testimony of the witnesses for the state are incorrect, cannot be upheld in view of the verdict of the jury returned in this case. It is just as reasonable for the jury to have believed that defendant left the Edmond well some time before 11:30 as to have believed that the state's witnesses were mistaken as to the time they saw the defendant at the filling station in Chandler. It has always been the rule of this court that the verdict of the jury will not be set aside where there is evidence to support it, and certainly there is substantial evidence to support it in this case.

Counsel for defendant in brief, discussing the question of the insufficiency of the evidence to sustain the judgment, presents a question of the identification of the defendant by the witness Helen Grindstaff.

A number of witnesses were presented by defendant who made a test of the lights on defendant's car at the time of the trial, and they testified that in their judgment it would have been impossible for a person to have identified one they did not know. That the lights on the dashboard of the car reflected downward, and would not reveal the face of the driver of the car. These tests were made in a garage where defendant's automobile was stored, and after a battery had been placed therein. The

state contends that these tests were not made under the same conditions that existed on the highway on the night of August 17, 1941.

The defendant also contended that Helen Grindstaff did not identify the defendant until the trial of this case, and that she had made statements immediately following the killing that she could not identify the party in whose car she and Billie Grayson entered. This contention is based upon the testimony of two witnesses offered by the defendant, Bette Dean Boggs and Margaret Eakin, and on the testimony of the witness Helen Grindstaff at the preliminary hearing of defendant.

Bette Dean Boggs testified that on August 17, 1941, she was employed by a Chandler newspaper as a reporter. That on the 18th day of August, 1941, she had occasion as such reporter to interview Helen Grindstaff at her home with reference to the killing of Billie Grayson, and especially as to whether she could identify the party in whose car she and Billie Grayson entered. She was asked if Helen Grindstaff did not make this statement:

"I was scared to death, just too scared to tell what he looked like. I'd rather not try to describe him—I might be wrong and get some man into trouble. I wouldn't even known his voice if I heard it."

Her answer to that question was "yes."

Margaret Eakin, who was also connected with the same Chandler paper, testified that she was present when the above interview was had, and corroborated the testimony of Miss Boggs. She also testified that she asked Helen several questions, and that she said she had never seen the party before, that she didn't know how old he was, or whether he was large or small build, and did not

know whether he had a hat, and that she could not tell the color of the suit of clothes he was wearing.

It may be here stated that the identification of the defendant by the witness Helen Grindstaff was a question of fact for the jury to determine, under all the facts and circumstances. It must be borne in mind that the interview of the news reporters was on the day following the homicide. This witness could have been, and no doubt was, very much upset upon learning of the death of Billie Grayson, and under the circumstances of having been with her just prior to her death. The identification of the defendant was made by her at the trial, and after defendant's return from Ohio. No doubt the jury took this into consideration, together with the other facts and circumstances in the case. She did describe quite minutely the automobile which she and Billie Grayson entered, and when defendant was arrested in Ohio his automobile was very much like the one she described. This was also a question of fact for the jury to consider, together with all the evidence and circumstances in the case.

As to defendant's second contention, that the court erred in failing to submit to the jury instructions upon manslaughter in the first and second degrees, and assault and battery, the record reveals that when the case closed, counsel for defendant requested the court to so instruct the jury. No written instruction was prepared and presented. The court refused to give such instructions, and the defendant excepted.

It is well settled by the decisions of this court that where a defendant is charged with the crime of murder, it is the duty of the trial court to instruct on the law of manslaughter in the first or second degree, if there is any evidence that the alleged crime might have been com-

mitted under circumstances that would reduce the crime from murder to manslaughter. Tucker v. State, 66 Okla. Cr. 335, 92 P. 2d 595.

But the trial court is vested with a discretion, which is subject to review upon appeal, and this judgment will not be disturbed unless the record presents a clear case of abuse of discretion. As stated in the case of Newby v. State, 17 Okla. Cr. 291, 188 P. 124:

"The trial court is not required, however, to delve into the realms of conjecture or speculation in order to instruct upon some chimerical theory of the law of the case not reasonably supported by the evidence." See also Williams v. State, 56 Okla. Cr. 147, 35 P. 2d 282; and Williams v. State, 12 Okla. Cr. 39, 151 P. 900.

Here the theory of the defendant was that the manslaughter instructions should have been given by reason of the fact that the testimony revealed that in attempting to secure a statement from defendant, the sheriff of Lincoln county told him that if he killed the deceased while in a fight, it would go easier with him; and the further evidence of the witnesses Anderson and Lowery that defendant told them he picked the girls up, but did not kill Billie Grayson.

We do not see that this testimony required the giving of manslaughter instructions. The defendant's main defense was that he did not pick the deceased up, and that he did not kill her, and he so testified. The evidence of the state was that the deceased had been murdered, and that her body had thereafter been disrobed and placed in the cemetery. We think the trial court was justified under the circumstances and evidence in submitting only the question of murder, and not the issue of manslaughter in the first or second degree, or of assault and battery.

The third assignment of error is that the court limited the number of witnesses offered by defendant to prove his good character and reputation. This was a question within the sound discretion of the trial court. This discretion is subject to review by the appellate court, and is governed by the facts and circumstances of each individual case. The trial court should exercise this discretion with caution, and should be governed by the importance of the testimony as applied to the facts of the case under consideration. 23 C. J. S., Criminal Law, p. 429 § 1042; 16 C. J. p 859.

In the case of Durant v. State, 32 Okla. Cr. 288, 240 P. 1088, it was said:

"The number of witnesses that may be heard on behalf of a party to establish a point or proposition, particularly on matters collateral to the main issue, is within the reasonable discretion of the trial court.

"In a homicide case, where the state, by offering no evidence to refute, virtually concedes that the deceased was a dangerous and turbulent character, it is not reversible error for the trial court to limit the defendant to four witnesses to prove such character."

In the instant case the court permitted the introduction of ten witnesses to testify to the good character and reputation of the defendant. The state did not offer any testimony attacking his character and reputation. Under these circumstances it occurs to us that the discretion of the court was not abused, and that he was very considerate in permitting the number of witnesses to testify upon this issue. Cope v. State, 23 Okla. Cr. 161, 213 P. 753.

The fourth assignment of error is that the court erred in not sustaining defendant's objection to the argument of the county attorney.

This assignment has reference to a statement made by the county attorney in his closing argument, as follows: "Why did he run the risk of prosecution by running off with a mortgaged automobile?" And a statement by the Assistant Attorney General, as follows: "In going out to this well, part of the road was through Oklahoma City."

While the statement of the county attorney might be objectionable, there was not such error as would justify a reversal of this case. One of the witnesses who testified for the defendant stated that his reason for checking the car after it was returned to Oklahoma, was to see if his security was in good shape. The statement of the Assistant Attorney General was a legitimate deduction from the evidence offered in the case.

By reason of the importance of this case, we have given it careful consideration. It is our conclusion that the defendant had a fair and impartial trial. His defense was well presented, and the issues of fact passed upon by a fair and impartial jury. As an appellate court, we should not set aside the judgment and sentence unless there was insufficient evidence to sustain the same. We do not find that to be the case. The assessment of life imprisonment is a severe penalty, but the crime here committed was a brutal one, and the one who perpetrated it deserves the most severe punishment. A jury has decided that the defendant was guilty under the testimony submitted. It is our duty under the law to uphold this verdict, when the evidence supports it.

It is therefore ordered that the judgment of the district court of Lincoln county be and the same is affirmed.

JONES, P. J., concurs. DOYLE, J., not participating.