# LLOYD WEHR v. STATE.

No. A-10360.    Jan. 31, 1945.

(155 P. 2d 731.)

Rollie D. Thedford, Laynie Harrod, and Frank Wilton Jones, all of Oklahoma City, for plaintiff in error.

Randell S. Cobb, Atty. Gen., E. J. Broaddus, Asst. Atty. Gen., and Hugh J. Adams, Co. Atty., of Guthrie, for defendant in error.

BAREFOOT, P. J. Defendant, Lloyd Wehr, was charged in the district court of Logan county with the crime of sending a threatening letter with the intent to extort money, was tried, convicted and sentenced by the court to serve a term of four years in the State Penitentiary, and has appealed.

The assignments of error relied upon for reversal of this case are:

"1. The verdict is not sustained by sufficient evidence.

"2. That the court erred in overruling the motion of the defendant for a directed verdict.

"3. Error of the court in admitting evidence, violative of defendant's constitutional rights."

The first two assignments may be considered together, and this necessitates a short review of the testimony.

The statute under which defendant is charged is Tit. 21 O. S. 1941 § 1486, which reads:

"Every person who, with intent to extort any money or other property from another, sends to any person any letter or other writing, whether subscribed or not, express-

ing or implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat."

Chris Bohn, who may be designated as the prosecuting witness, resided at his home six miles northwest of Orlando, in Logan county. On the night of December 22, 1942, a letter was placed between the front door and the screen door at his home, and found by him on the morning of December 23, 1942. The letter was as follows:

(skull and cross bones)
"gaNG

(skull and cross bones)
(8)

### Beware
### Mr. Bone

"Your little girls life will be in great danger if you don't pay? Dont spoil a happy Christmas?? Better pay than always be sorry? Have $650.00 cash—by Tuesday night Dec. 23—in 5, 10, 20 and 50 dollar bills in a paper sack—behind east toilet at Rock Church on north side (over) of Orlando. You and your familys lives will be in danger. If you tell anyone about this. (Skull and cross bones) Dont risk your lives? Dont try to betray the gang and no harm will ever come (skull and cross bones) Wrote in blood of last victim. Protect loved ones.
"Gang of Missouri      (8)
(Skull and cross bones)
X   X   X   X   X   X  ·X   X

"Warning
"Before 12 o'clock
"Tuesday night."

This letter was written, or printed, with mercurochrome. It was in an envelope, written on both sides with pencil:

"Mr. Christ Bone"                    "Mr. Christ Bone."

The originals and photostatic copies are attached to the record.

Upon finding this letter, Mr. Bohn consulted with the mayor of Orlando. They took the letter to Guthrie, the county seat of Logan county, and the above facts were presented to Clayton Harlan, sheriff of Logan county.

Arrangements were made for laying a trap to catch the party who had written the letter. In pursuance of this plan, Mr. Harlan, and two of his deputies, Rex Harman and Cliff Hatfield, went to Orlando, arriving there between 9 and 10 o'clock in the evening of December 23d. They contacted Emil Hinke, the mayor of Orlando, and a Mr. Lafon, and completed their plans.

The "rock church" mentioned in the note faced the south, on the north side of the town of Orlando. There were two toilets behind the church, which proved to be 27′ 5″ apart, and another toilet in the rear of the parsonage, 93′ 10″ east of the east toilet behind the church. These three toilets were in a straight line, east and west, and the note directed the "sack" to be placed behind the one in the center, which was the east one serving the church.

The sheriff concealed himself in the toilet back of the parsonage, and Mr. Hinke, Cliff Hatfield, and Rex Harman went in the church building. About 10 o'clock Mr. Bohn, the prosecuting witness, as arranged, deposited a paper sack behind the center toilet, as directed in the note, and immediately left the premises.

After a two hour wait, and just about 12 o'clock midnight, the sheriff stuck his head out the door of the toilet, and saw someone approaching from the south, and who turned west, toward the toilet in which he was concealed.

He pulled the door up and watched through a crack. When the party was within about 18 inches, the sheriff tried to grab him. The party hit the sheriff in the stomach with a rock, and ran. The sheriff called to him to "halt" and then fired three shots, but the party escaped.

At the trial, Sheriff Harlan testified positively that the party whom he attempted to apprehend was the defendant; that he knew defendant; that he had been confined in his jail previously; that at one time he was within six inches of defendant; positively identified him, and stated that he could not be mistaken about the identification.

On the following morning, December 24th, the sheriff followed the tracks made by the party who ran from the toilets. They went north about two blocks into a field, and from there east about two blocks, up an alley, and to the north end of the Ryerson jewelry store, in Orlando.

The sheriff obtained a bottle of mercurochrome at the Ryerson jewelry store, and certain testimony, which is commonly known as "hearsay testimony," was admitted. This testimony was that Mr. Ryerson told the sheriff that the defendant was at the jewelry store about ten minutes before 12 o'clock on the night of December 23, 1942, and returned there "a little after midnight", and that the tracks found in the rear of the jewelry store were the tracks of the defendant.

The reason for the admission of the "hearsay testimony," as stated by the court, was that the defendant had opened up the matter. It may be here said that defendant does not contend in his brief that this was error, and an examination of the record reveals that the witness Harlan was questioned on cross-examination with reference to the conversation between him and Mr. Ryerson, and that

the questions asked by the county attorney were after the matter had been opened up by counsel for the defendant. Valentine v. State, 16 Okla. Cr. 76, 194 P. 254; Adams v. State, 62 Okla. Cr. 167, 70 P. 2d 821; Janeway v. State, 62 Okla. Cr. 264, 71 P. 2d 130.

The sheriff made no attempt to fit the shoes worn by defendant at the time of his arrest on December 24, 1942, to the tracks found. His reason for not doing so was that defendant stated to him that he had changed his shoes. This the defendant denied. The sheriff made no attempt to find fingerprints on the letter, because it had been in the hands of a number of persons before reaching his office.

The state introduced in evidence samples of writing and printing done by the defendant at the request of the county attorney, after his arrest. These originals are attached to the case-made for inspection by the court.

The state also offered three expert witnesses, and each of them testified that in his opinion the person who wrote the letter, and the person who wrote the exhibits above mentioned, was one and the same person.

The main defense of the defendant was that he did not write and did not send the letter, and also that of an alibi.

The defendant presented a strong alibi, and that issue was submitted to the jury under proper instructions. His alibi concerned his whereabouts on the nights of December 22 and 23, 1942. He testified, and was corroborated by a number of witnesses, that on the night of December 22d he attended a party at the home of Mr. and Mrs. Chas. F. Jerome, four miles north and three miles west of Orlando. They all testified that they made candy, and played bridge, and to the fact that one of the boys at

the party had been before the draft board on that day with reference to his induction into the army. They all testified that the defendant left the party at 1:30 in the morning, in company with a young lady, and he and the young lady testified that he took her directly home. He testified that after taking her home, they sat in his car in the yard for a while, and he then went to his home one and a half miles northwest of Orlando, arriving there about 2:30, and stayed the remainder of the night; and testified that he did not go to the Bohn home, and did not place the letter there.

He testified that his sister, Cleo Stagner, and the young lady he was with the night before, Lucile Nida, having purchased the candy for the Christmas tree treats for the church, returned to his home in the late afternoon of December 23d, and that they stayed there until time to go to the church. That he and Lucile Nida left his home early to go to the church to take the presents for the children and the Christmas tree treats, and to help decorate the tree. They did not leave the church, attended the services, and he and the same young lady left the church about 10:30 in the evening in his automobile. They drove around the streets of Orlando a short time, and then left town, going toward Perry, defendant said for the purpose of getting some sandwiches. They had an argument about going when they were three or four miles out of town, and decided not to go, turned around and went to the home of his sister, Cleo Stagner, six miles west and one-half mile south of Orlando, with whom Miss Nida was to spend the night. As they returned to town, after starting to Perry, defendant testified that he was having trouble with the lights on his car. He drove up to the Ryerson jewelry store, got out of the car and went in and got a flashlight, fixed his car lights, returned the flashlight,

and drove to the home of his sister. He testified that it was "not over ten or fifteen minutes at the most" from the time he drove up to the jewelry store until the time he left, and that they arrived at the home of his sister before 11:30. His sister's little boy was playing with the toys he had received at the Christmas tree. His sister mentioned that it was 11:30 and time for the baby to be in bed, and she and the baby retired. He and the young lady visited and played the radio until about 1:30, when she retired to the room with his sister, and he went to bed in the kitchen. Both his sister and the young lady, Lucile Nida, corroborated this testimony, and all testified that he did not leave the sister's home that night after arriving before 11:30, and that he was there the next morning. The mother of defendant went to the home of Cleo Stagner during the morning and told them that the sheriff had been at his home looking for him, and the defendant went home and remained there until the sheriff arrived in the afternoon, December 24, 1942, arrested him and took him to Guthrie.

The defendant offered the evidence of D. B. Patterson, of Oklahoma City, a handwriting expert. He testified to an examination of the letter and the exhibits offered by the state, and to admitted writings and printings of the defendant. He testified that in his opinion the defendant did not write the letter in question. This witness went into detail in explaining how he arrived at his deductions, but it is unnecessary to here review the same.

Defendant introduced a number of substantial character witnesses who had known him for many years, and who testified to his good character and reputation. These witnesses, on cross-examination, all stated that they had heard of defendant pleading guilty to a charge of burglary when he was 19 years of age, and of his being sentenced to serve a term of three years in the State Reformatory at

Granite; and to his being tried after that on a petit larceny charge at Perry, and being acquitted. The evidence disclosed that he was paroled from Granite after serving eleven months of his sentence.

The contention of defendant that the evidence is insufficient to sustain the judgment and sentence is based largely upon the theory that the identification of the defendant by the sheriff is unreasonable, under the circumstances surrounding such identification; and that the judgment is founded upon circumstantial evidence.

With reference to the contention that the judgment is based upon circumstantial evidence, it may be said that the identification of the defendant by the sheriff was direct and positive testimony, and was not circumstantial. The contention with reference to the identification of the defendant is clearly based upon the question of the weight of the testimony. It has often been held by this court that we will not pass upon the weight of the testimony, or the credibility of the witnesses. The identification of defendant by the sheriff was positive, and he gave his reasons for being able to identify him. It might be that the sheriff could have and should have procured other evidence to corroborate his testimony, but this only goes to the weight to be attached to his testimony, which, as above stated, was a question for the jury. The fact that he made no attempt to fit the shoes of defendant in the tracks he found, and that he did not examine the letter for fingerprints, was for the proper consideration of the jury, together with all other facts and circumstances in the case.

As above stated, the issue of alibi was fully and fairly presented to the jury. The defendant by his own testimony admits that he was in close proximity to the scene of the crime at the time the letter was delivered, and also at the time of the attempt to get the money supposed to be

deposited in the sack, according to the terms of the letter received by the prosecuting witness. In the recent case of Orrell v. State, 79 Okla. Cr. 300 154 P. 2d 779, this court had occasion to refer to an alibi where the evidence revealed the presence of the defendant in close proximity to the scene of the crime at the time it was committed. See, also, Gregg v. State, 69 Okla. Cr. 103, 101 P. 2d 289, and Boydston v. State, 79 Okla. Cr. 172, 152 P. 2d 701.

The contention of defendant that evidence was admitted which violated his constitutional rights is based upon the fact that defendant, after refusing to make a statement to the county attorney, was asked to write and print certain words which appeared in the letter under consideration. The defendant complied with this request, and his own evidence is the best answer to this contention. He testified:

"A. Well, they wanted me to come up and make a statement, and I told them I didn't know no statement to make, so they took me up any way and they started asking me some questions, first one and then another, and kept on and they wanted me to write and I set down and started to write, and they give me a pen and paper and tried to tell me how to write and what slant to write. Q. Who did that? A. The county attorney and sheriff. Q. Mr. Hugh Adams and the sheriff, Harlan? A. Yes, sir. Q. Go ahead. A. I thought and I kinda hesitated and they would try to get me to write faster and Mr. Adams would leave the office and go in the next room and come back and say something to write and if I wouldn't write it right then, he was in a hurry, and the sheriff was standing in front of the desk, and at the same time he was trying to tell me how to write, Mr. Adams was trying to do the spelling and everything and I just plumb refused to write. Q. And due to their haggling and third degreeing, you finally refused to write? A. Yes, sir. I didn't have to write. I was writing voluntarily. They wasn't making me do anything."

And on cross-examination:

"Q. Tell me what they did do. A. They were trying to show me how to write and how to hold everything to write with, took a mercurochrome stopper out and told me how to hold it, and when I would hesitate they would spell for me."

It will thus be seen that the writing by defendant was purely voluntary. He was instructed by the county attorney that anything he wrote or said might be used against him, and that he was in no way offered immunity or reward. Under this statement, it is clear that the constitutional rights of the defendant were not violated in this case. Fry v. State, 78 Okla. Cr. 299, 147 P. 2d 803, and cases therein cited.

We have carefully considered the record in this case, and have come to the conclusion that the defendant had a fair and impartial trial, and was convicted by a jury of his peers in his home county. He presented a strong defense, and if believed by the jury they would have acquitted him. An appellate court should not set aside the verdict of the jury where there is sufficient evidence to sustain the same. The weight of the evidence and the credibility of the witnesses are clearly questions for the jury. If the defendant was guilty as found by the jury, the punishment assessed is not excessive, taking into consideration the crime committed.

For the reasons above stated, the judgment and sentence of the district court of Logan county is affirmed.

JONES, J., concurs. DOYLE, J., not participating.