## SMITH v. STATE.

No. A-11084. Oct. 12, 1949.

(210 P. 2d 675.)

Harold McArthur, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BRETT, J. The plaintiff in error, David Smith, defendant below, was charged by information with the crime of the murder of Gladys Lanier in Tulsa, Okla., on October 6, 1947. He was tried by a jury in the district court of Tulsa county, Okla., convicted, and sentenced to the penitentiary to life imprisonment.

This appeal from the judgment and sentence therein imposed involves only one contention, that the trial court erred in its refusal to give the defendant's requested instructions 1, 2 and 3 on manslaughter in the second degree. In considering this contention it is only necessary to call attention to the fact that the court instructed the jury on murder and accidental killing. Therefore, in resolving this issue, it is necessary that we consider the evidence in order to determine whether or not the court would have been justified in giving an instruction on second degree manslaughter, which is defined by Title 21 O. S. 1941 § 716, as follows:

"Every killing of one human being by the act, * * * of another, which, under the provisions of this chapter, is not murder, nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree."

Briefly, the state's theory supported by proof discloses that the defendant, a negro married man, and

Gladys Lanier, the victim, a negro woman, separated from her husband but undivorced, had kept company for some time. However, shortly prior to the killing Gladys Lanier was trying to break off her relations with the defendant, and had started going with George Cheatham, a single man. She was going with Cheatham what might be termed steady. The record shows that notwithstanding, David Smith made it a point to see them when they were out together. On the night of October 5, before the killing in the early morning of the 6th of October, 1947, Gladys was out with Cheatham until near midnight. In the interim, from the time until they left until their return, the defendant came to Gladys Lanier's home and inquired for her and was told by her mother that she was not there. He was not satisfied and pushed into the house and peeked around trying to find her, and then said "I guess I will just jog along back". Whereupon, he left. Thereafter he made repeated telephone calls in an endeavor to contact Gladys Lanier. Finally, he parked himself near the Lanier home on the back side of the automobile of a friend where he could "gawk" through the window, and waited for the victim to return to her home. George Cheatham saw him by the light of the headlight of the automobile in which he was riding as he turned the corner. The record shows that the defendant said to his friend when the car in which Gladys and George were riding passed, "I believe there come my girl and her boy friend. Buster, you knows I just love that girl. I believe I will go and call her". Thereupon he left and returned and said that he did call her; that at the time the first call was made George Cheatham was still there. The record further discloses that after Cheatman left he called again; that Gladys Lanier's mother, Mrs. Givens, was near the telephone receiver; that he was talking so loud his voice could be heard and identified distinctly

all over the room, he was so angry. He tried to get Gladys to come where he was and cursed her and used vile language in connection with her and her mother, too vile to be reproduced herein. Upon her refusal to come to him he said he would come to her home. Soon thereafter the defendant appeared and shook the door. Gladys' mother admonished her not to go to the door, but she did anyway and opened it. The defendant stepped in and spoke so fast, so angrily, and in such "garbled talk," Mrs. Givens could not understand what he said to Gladys; a shot rang out, Gladys screamed "Oh, mama", and fell to the floor mortally wounded, shot in the mid-portion of the chest, dying immediately. The defendant slammed the door shut and fled. A little later he returned and shook the door again. Mrs. Givens, the victim's mother, asked who it was and the defendant said "George". She said she told him "No, it wasn't George Cheatman but David Smith" and he could not come in. This in substance was the state's case predicated upon the theory that the victim's death constituted murder committed in the heat of jealous rage.

The defendant offered evidence to establish that there was no animosity toward the victim in the least. He attempted to establish that the killing of Gladys Lanier was purely accidental and unintentional. The record is replete with evidence that that was the sole and only theory of the defense. The cross-examination of Officer Alexander, who interrogated the defendant immediately after the killing, discloses that the defense was to be accidental death. The defendant testified in his own behalf that he called Gladys Lanier immediately preceding the killing and arranged with her to go out with him. He said it was no uncommon thing for them to go out together at that time of night in the early morning.

His positive testimony establishing the accidental theory reads as follows:

"Q. After you had knocked on the door, did anybody come to the doorway in response to your knock? A. Gladys did. Q. And who opened the door? A. She did. Q. Did you step inside? A. I sure did. * * * Q. Now, what was the first thing that was said between you and Gladys? A. I said, 'Oh, you are all ready to go.' She said, 'Where are we going?' I said, 'We will find some place to go.' She said, 'This late? I said, 'Yes.' She said, 'You got the gun?' I said, 'Yes.' Q. All right, then what happened? A. She said, 'Let's see it'; so I pulled it out, she grabbed the gun and it went off. Q. Have you got any idea why she made a grab for that gun? A. I sure don't I really don't, I have wondered a million times why she did it. Q. Did you have your hand on the trigger of that gun at any time? A. No, sir, I did not. Q. What did you do at the time the gun went off? A. Well, it scared me so bad I stood there, I didn't do nothing, I was just standing. She said, 'David, I am shot,' and I was just still standing there and when she fell, then I opened the door and went and called the ambulance. Q. She fell? A. Yes, sir. Q. As you walked out that—now, you knew there was a telephone in the back end? A. I didn't even think about a telephone in the back, I didn't know where I was going, I was so scared. * * * Q. When you came out of there, did you see anybody near the rear, around Turner's Tavern? A. Two men or two boys or something was sitting on the two bottom steps, right at the bottom of the steps. Q. Do you know who they are? A. No, sir, I didn't. Q. Did you make an effort to determine who they were? A. I didn't try, they saw me running and they asked me, 'What is the matter?' I said, 'A lady got shot accidently.' I went on to call the ambulance, didn't stop to see them or nothing. * * * Q. Well after the officers came, who was the first one that discussed with you as to what happened? A. I think it was Mr. Alexander. I think it was, I think that is the first one discussed it with me. Q. Did you tell him and

show him what happened? A. I sure did. Q. And was his testimony in which he said that you demonstrated how it happened—is that substantially correct? A. Yes, sir, just like I told him, kind of demonstrated just like I told him."

On the issue of murder or accidental killing in light of the court's instructions the jury resolved the issue against the defendant.

At no place in the record herein does the defendant advance or support the theory that the killing was the result of culpable negligence. From start to finish the case is pitched on the sole theory of murder or accidental killing. Thus the giving of an instruction on second degree manslaughter was entirely excluded. The jury from the testimony in the case at bar could honestly and intelligently return only one of two verdicts, guilty of murder or acquittal on the ground the killing was accidental and unintentional. It would have been error for the court to have instructed the jury on second degree manslaughter. Such an instruction would have been favorable to the defendant but error nevertheless, for there is nothing in either the state's or the defendant's case to establish culpable negligence on the part of the defendant in the handling of the pistol, for according to his theory he handled it in a careful and prudent manner and death ensued when the victim grabbed it causing it to discharge. Trial courts should instruct only as to the charge laid in the information or indictment, the defense interposed and the testimony in the case. Stokes v. State, 86 Okla. Cr. 21, 189 P. 2d 424; Shepperd v. State, 51 Okla. Cr. 209, 300 P. 421. In Forrester v. State, 45 Okla. Cr. 205, 282 P. 682, the rule was stated as follows:

"In charging the jury due regard must be had to the state of the case, the character and amount of proof,

and the law as stated to the jury must be applicable to the pleading and testimony."

In Scott v. State, 84 Okla. Cr. 171, 180 P. 2d 196, 197, it was held:

"It is not error for the court to refuse to give a requested instruction in the absence of any substantial evidence to support the giving of the same." Pitts v. State, 53 Okla. Cr. 165, 8 P. 2d 78.

It is axiomatic in the law that the allegations and proof should correspond. It is also axiomatic that the instructions should likewise conform to the allegations and the proof of both the state and the defense. In the case at bar, to have submitted the issue of manslaughter in the second degree would have been to inject into the case an issue not supported either by the information or the proof of either the state or the defense.

We find no fault with the rules contended for by the defendant in 26 Am. Jur. §§ 210, 212. We merely say they have no applicability to the facts in the case at bar. Neither do the authorities cited and relied upon by the defendant support his theory, Ballard v. State, 12 Okla. Cr. 277, 154 P. 1197; Spratt v. State, 55 Okla. Cr. 1, 23 P. 2d 223; Robinson v. State, 58 Okla. Cr. 213, 52 P. 2d 100; Smith v. State, 59 Okla. Cr. 111, 56 P. 2d 923; Cooper v. State, 61 Okla. Cr. 318, 67 P. 2d 981; Clark v. State, 63 Okla. Cr. 138, 73 P. 2d 481; Sweet v. State, 68 Okla. Cr. 44, 95 P. 2d 242; Wilson v. State, 70 Okla. Cr. 262, 105 P. 2d 789; Orrell v. State, 79 Okla. Cr. 300, 154 P. 2d 779; Elix v. State, 77 Okla. Cr. 45, 138 P. 2d 139. The defendant, however, cites Tucker v. State, 66 Okla. Cr. 335, 341, 92 P. 2d 595, 598, which clearly does not support his position but to the contrary, says:

"It has often been held by this court that it is unnecessary for the court, in a murder case, to give an in-

struction submitting the question of manslaughter in the first or second degree, where that issue is not raised by the evidence. Newby v. State, 17 Okla. Cr. 291, 188 P. 124; Collins v. State, 22 Okla. Cr. 203, 210 P. 285, 30 A.L.R. 811, and cases cited therein."

Such is the case at bar. There are no facts warranting the giving of the requested instruction on second degree manslaughter. Here, had the court given the requested instruction on its own volition, the defendant no doubt would be complaining that the court injected an element into the case not supported by the record, all to his prejudice. The contention that the court erred in refusing to give the requested instruction on second degree manslaughter is therefore without merit, and the judgment and sentence herein imposed is accordingly affirmed.

JONES, P. J., and POWELL, J., concur.